**Lee C. RITCHIE, et al., Petitioners,**

**v.**

**Ann Caldwell RUPE, As Trustee for the Dallas Gordon Rupe, III 1995 Family Trust, Respondent.**

No. 11–0447.

Supreme Court of Texas.

Argued Feb. 26, 2013.

Decided June 20, 2014.

Rehearing Denied Oct. 24, 2014.

Eric Thomas Stahl, Law Offices of Frank L. Branson, P.C., Dallas, TX, for Amicus Curiae Cruz, M.D., Erwin.

John Richard Fahy, Whitaker Chalk Swindle & Schwartz PLLC, Fort Worth, Rex S. Whitaker, Baird, Crews, Schiller & Whitaker, P.C., Temple, Wayne Martin Whitaker, Whitaker Chalk Swindle & Schwartz PLLC, Fort Worth, TX, for Amicus Curiae Fahy, John R. Wayne Whitaker and Rex Whitaker.

Carol Bavousett Mattick, Attorney at Law, San Antonio, TX, for Amicus Curiae Mattick, Carol Bavousett.

Elizabeth Stone Miller, Attorney and Professor of Law, Waco, TX, for Amicus Curiae Miller, Elizabeth S.

Marc I. Steinberg, SMU Dedman School of Law, Dallas, TX, for Amicus Curiae Steinberg, Marc Robert A. Ragazzo, Alan R. Bromberg, Joseph K. Leahy, Bruce A. McGovern, Gary S. Rosin, and David Simon Sokolow.

Peter M. Kelly, Kelly, Durham & Pittard, L.L.P., Houston, TX, for Amicus Curiae Texas Trial Lawyers Association.

Amy Elaine Davis, Katherine Khristine Elrich, Hermes Sargent Bates LLP, Hilaree A. Casada, Cowles & Thompson, P.C., Robert B. Gilbreath, Hawkins Parnell, Thackston & Young LLP, Dallas, TX, for Petitioner.

Brett David Kutnick, Hankinson LLP, Charla G. Aldous, Aldous Law Firm, Jeffrey S. Levinger, Levinger PC, Steven E. Aldous, Forshey & Prostok LLP, Dallas, TX, for Respondent.

Justice BOYD delivered the opinion of the Court, in which Chief Justice HECHT, Justice GREEN, Justice JOHNSON, Justice LEHRMANN, and Justice DEVINE joined.

In this case, a minority shareholder in a closely held corporation alleged that the corporation's other shareholders, who were also on the board of directors, engaged in "oppressive" actions and breached fiduciary duties by, among other things, refusing to buy her shares for fair value or meet with prospective outside buyers. The directors essentially admit to this conduct but insist that they were simply doing what was best for the corporation. For the most part, the jury sided with the minority shareholder, and the trial court ordered the corporation to buy out her shares for $7.3 million. The court of appeals agreed that the directors' refusal to meet with prospective purchasers was "oppressive" and upheld the buy-out order. We hold that this conduct was not "oppressive" under the statute on which the minority shareholder relies, and in any event, the statute does not authorize courts to order a corporation to buy out a minority shareholder's interests. Moving beyond the statutory claims, we decline to recognize or create a Texas common-law cause of action for "minority shareholder oppression." We thus reverse the court of appeals' judgment. Because the court of appeals upheld the judgment based on the oppression claim and did not reach the breach-of-fiduciary-duty claim, we remand the case to the court of appeals.

## I.

## Background

Rupe Investment Corporation (RIC) is a Texas closely held corporation.[1] Before this dispute arose, RIC's board of directors had four members: Paula Dennard, who chaired the board; Dallas Gordon Rupe, III (Buddy), who was Dennard's brother; Lee Ritchie, who served as president of RIC; and Dennis Lutes, an attorney whose clients included RIC, Dennard,

---

1. A corporation is "closely held" if it has fewer than thirty-five shareholders and its stock is not publicly traded. *See* TEX. BUS. ORGS.CODE § 21.563.

and her family. Paula Dennard and Buddy Rupe were the descendants of RIC's founder, and Ritchie is the descendant of one of its early owners. Three different family trusts collectively owned approximately 72% of RIC's voting stock.[2] Dennard, Ritchie, and Lutes served as trustees of those trusts and thus collectively controlled a majority of RIC's voting power. Ritchie and his family also owned an additional 10% of the shares directly, increasing the combined voting power to 82%. Buddy owned the remaining 18% directly. There was no shareholders' agreement.

Ann Rupe joined the family when she married Buddy in 1983. Rupe was Buddy's second wife, and their marriage and the birth of their son, Guy, took place after the death of Dennard and Buddy's father, Gordon. Gordon's will created Gordon's Trust, which named Gordon's wife, his children (Dennard and Buddy), and Dennard's three children as beneficiaries. Buddy and Rupe wanted their son to be added as a beneficiary of Gordon's Trust, but Dennard and her children refused, and this created some friction between Rupe and Dennard. According to Rupe, Dennard treated Rupe "as an outsider" from the very beginning, and told her that she would "never get any money in this family." With Buddy's encouragement, Rupe began considering a lawsuit to reform Gordon's Trust to add Guy as a beneficiary.

Buddy died in 2002. His 18% interest in RIC had been placed in a trust for the benefit of Rupe and their son (Buddy's Trust), naming Rupe as trustee.[3] In Rupe's view, Dennard, Ritchie, and Lutes immediately became "hostile" towards her and feared that she would sue to reform Gordon's Trust. At one point, Ritchie, with Dennard's and Lutes's approval, offered to appoint Rupe to replace Buddy on RIC's board of directors, but only if she would agree not to file suit against Gordon's Trust. Rupe declined, and instead asked Ritchie if RIC would be interested in buying out her shares. Ritchie replied that RIC could not at that time because one of RIC's subsidiaries, Hutton Communications, was going through a financial crisis. Soon thereafter, Rupe's attorney sent a letter to Lutes, requesting the opportunity to review and copy RIC's corporate documents[4] and directing the Rupe and Ritchie family members not to communicate directly with Rupe regarding RIC or any other business matters.

On behalf of RIC, Lutes later offered to redeem Rupe's shares for $1 million. With this offer, he told Rupe that "any further discussions regarding a possible stock redemption would be pointless until the Hutton Communications situation is finally re-

2. Since the filing of this suit, one of the trusts, known as Ruby's Trust, has been terminated and its shares distributed amongst Dennard's three children and her step-sister, Robin Rupe.

3. Rupe brought this lawsuit in her capacity as trustee for Buddy's Trust, the actual owner of the 18% voting shares in RIC. We will generally refer to Rupe and to "Rupe's shares," however, meaning Rupe in her trustee capacity and the shares owned by Buddy's Trust.

4. Either personally or through her various attorneys, Rupe requested RIC documents on several occasions. The record indicates that RIC repeatedly provided some documents or access in response to these requests. Nevertheless, in correspondence and at trial, Rupe's attorneys contended that RIC was not as forthcoming with its corporate books and records as their fiduciary duties and the Texas Business Organizations Code require. The jury agreed, but the court of appeals determined that the evidence was legally insufficient to support this finding, and Rupe has not challenged that holding in this Court. See 339 S.W.3d 275, 304–05. We therefore omit these details, and our judgment preserves the court of appeals' unchallenged holding on this issue.

solved," and he encouraged Rupe not to redeem the shares until they "ultimately" increased in value. Rupe's attorney declined the redemption offer. Because RIC's sales exceeded $150 million and it had assets in excess of $50 million, he considered it "absurd" and an attempt "to take advantage of [Rupe]."

Rupe subsequently terminated her relationship with her attorney and personally requested a new redemption offer from Ritchie. Ritchie reiterated that he did not recommend selling her shares at that time, but he agreed to raise the issue at an upcoming board meeting. After the board meeting, Ritchie made a new offer of $1,760,947, which he said was based on a formula that RIC had previously used to value RIC's shares and, in any event, was "the highest cash offer that RIC directors believed they could make without jeopardizing the company and its other shareholders." Rupe declined the offer and decided to try to sell her shares to an outside party. She hired a new attorney and a broker, George Stasen, to market her shares. At Rupe's request, Dennard and Ritchie met with Stasen in March 2005. The meeting did not go well. Stasen, who described the meeting as "hostile," informed Dennard and Ritchie that he felt RIC's financial performance was "very, very unsatisfactory" and accused them of mismanagement. Stasen admitted at trial, however, that he had only a limited understanding of the company at the time. Nevertheless, throughout late 2005, Ritchie and Lutes worked with Stasen and Rupe's latest attorney to draft confidentiality agreements to allow Stasen to disclose some of RIC's confidential business information to Rupe's prospective outside purchasers.

In January 2006, Rupe sent a note to Ritchie, asking for dates when he could meet with prospective purchasers. After conferring with Lutes and an outside attorney with expertise in securities law, Ritchie sent a reply to Rupe declining to participate in such meetings. Ritchie stated that, because RIC would not be a party to the sale of her shares to an outside buyer, "it would be inappropriate for me or any other officer or director of [RIC] to meet with your prospects or otherwise participate in any activities relating to your proposed sale of stock." Stasen prepared marketing materials and provided them to potential buyers, but he did not succeed in selling the stock because, in his opinion, "everybody wanted to be able to meet Lee Ritchie and talk to the executives … as part of their due diligence." Although he determined that the book value of Rupe's stock was $3.9 million, he discounted that to $3.4 million because of the directors' refusal to meet with prospective buyers. In his view, however, it would be "incredibly difficult" to market Rupe's shares without such meetings, and the likelihood of selling the shares was "zero."

In July 2006, Rupe filed this suit against Dennard, Ritchie, Lutes, and RIC,[5] alleging that they engaged in "oppressive" conduct and breached fiduciary duties to her. Rupe requested an accounting and valuation and an order requiring RIC to purchase her shares at fair market value or, alternatively, appointing a receiver to liquidate RIC. The jury found in Rupe's favor on essentially all of her claims and found that the fair value of Rupe's stock was $7.3 million. The trial court rendered judgment on the jury's verdict, concluding that Dennard, Ritchie, Lutes, and RIC had "engaged in oppressive conduct to the rights

5. Rupe originally sued Dennard, Ritchie, and Lutes in their individual capacities, but later added them in their capacities as RIC directors and as trustees of the trusts that owned RIC's shares.

of [Buddy's Trust] that is likely to continue in the future," that "the most equitable remedy" for this oppression was to require RIC to redeem Rupe's shares, and that this remedy was "less drastic" than liquidating the company or appointing a receiver. Based on these conclusions and the jury's findings, the trial court ordered RIC to purchase Rupe's shares for $7.3 million. Dennard, Ritchie, Lutes, and RIC appealed.

The court of appeals held that their refusal to meet with Rupe's prospective purchasers constituted oppressive conduct as a matter of law. Having reached that conclusion, it did not consider whether other actions by Dennard, Ritchie, and Lutes were oppressive, as Rupe had alleged. The court upheld the trial court's order requiring RIC to purchase Rupe's shares, but concluded that the trial court had erred by instructing the jury not to discount the shares' value to account for their lack of marketability and control. 339 S.W.3d 275, 301–02 (Tex.App.–Dallas 2011). The court thus affirmed the finding of oppressive conduct but reversed as to the $7.3 million purchase price, and remanded the case to the trial court for a new determination of the shares' fair value. Dennard, Ritchie, and Lutes petitioned this Court for review, which we granted.

## II.

## Oppressive Actions Under the Receivership Statute

We begin by determining the meaning of "oppressive" as the Legislature used that word in the Texas receivership statute. This statute, former article 7.05 of the Texas Business Corporations Act, and its successor, section 11.404 of the Texas Business Organizations Code, authorize Texas courts to appoint a receiver to rehabilitate a domestic corporation under certain circumstances.[6] *See* Tex. Bus. Orgs. Code § 11.404. Although Rupe sought appointment of a receiver to liquidate RIC rather than rehabilitate it,[7] only sought that remedy as an alternative to other remedies, did not obtain that relief in the judgment, and does not request that relief on appeal, she relies on this statute as authority for the trial court's judgment ordering RIC to buy out her shares.

Former article 7.05 authorizes courts to appoint a rehabilitative receiver when it is "necessary" to do so "to conserve the assets and business of the corporation and to avoid damage to parties at interest," but only if "all other requirements of law are complied with" and "all other remedies available either at law or in equity, includ-

6. *See* Act of Mar. 30, 1955, 54th Leg., R.S., ch. 64, art. 7.05, 1955 Tex. Gen. Laws 239, 290–91, *amended by* Act of May 3, 1961, 57th Leg., R.S., ch. 169, 1, 1961 Tex. Gen. Laws, 319, 319 (formerly TEX. BUS. CORP. ACT art. 7.05), *expired Jan. 1, 2010*, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267 (current version at Tex. Bus. Orgs. Code § 11.404) [herein, former article 7.05]. The Business Corporations Act, now expired, was in large part recodified in the Texas Business Organizations Code. *See* Act of May 13, 2003, 82nd Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267. Although section 11.404 governs current actions for rehabilitative receivership, former article 7.05 was the

governing statute when the trial court rendered its judgment in this case. *See* Tex. Bus. Orgs.Code § 402.001–.005. The language of the two statutes is not identical, but for purposes of this case their differences are not material.

7. Former article 7.05 and current Section 11.404 only authorize the appointment of a receiver to rehabilitate a corporation. Under other circumstances, different sections of the statutes authorize courts to appoint a receiver to liquidate a corporation's property and business. *See* Tex. Bus. Orgs.Code § § 11.402, 11.405; former Tex. Bus. Corp. Act art. 7.06.

ing the appointment of a receiver for specific assets of the corporation, are determined by the court to be inadequate." Former art. 7.05(A); *see also* TEX. BUS. ORGS.CODE § 11.404(b). In addition, when the party seeking a receivership is a shareholder of the corporation, the party must also establish:

    (a) that the corporation is insolvent or in imminent danger of insolvency; or

    (b) that the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or

    (c) *that the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent;* or

    (d) that the corporate assets are being misapplied or wasted; or

    (e) that the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election and qualification of their successors.

Former art. 7.05(A)(1) (emphasis added); *see also* TEX. BUS. ORGS.CODE § 11.404(a)(1). Rupe relies on subpart (c), and asserts that Dennard's, Ritchie's, and Lutes's actions were "oppressive." Thus, we must determine what the Legislature meant when it used the term "oppressive" in this statute, whether the refusal to meet with Rupe's potential buyers fits within that meaning, and what remedies the statute provides for such actions.

## A. Cases Construing "Oppressive"

This Court has not previously construed former article 7.05 or current section 11.404. Initially, Texas courts of appeals construed the statute quite narrowly. In *Texarkana College Bowl, Inc. v. Phillips,* the court reversed a trial court order appointing a receiver based on oppressive actions, holding that a "stockholder's dissatisfaction with corporate management is not by [former] Article 7.05 made grounds for a receivership," and the shareholder was not entitled to a receivership based on acts that were "not inconsistent with the honest exercise of business judgment and discretion by the board of directors." 408 S.W.2d 537, 539 (Tex.Civ.App.-Texarkana 1966, no writ). The court thus incorporated the concept of the "business judgment rule" into its analysis of whether actions were oppressive under the statute. *See id.; see also In re Schmitz,* 285 S.W.3d 451, 457, 457 n. 33 (Tex.2009) (addressing the "business judgment that Texas law requires a board of directors to exercise").

Twenty-two years later, another court of appeals affirmed a trial court's denial of a petition for appointment of a receiver, holding that, in light of the statute's requirement that " 'all other remedies available either at law or in equity' are inadequate," the trial court "properly required an emergency on which to base the relief sought." *Balias v. Balias,* 748 S.W.2d 253, 257 (Tex.App.-Houston [14th Dist.] 1988, writ denied). Both *Phillips* and *Balias* involved closely held corporations like RIC, but neither court held that such corporations were entitled to any special treatment under the receivership statute, which does not distinguish between closely held and other types of corporations.[8] *See id.; Phillips,* 408 S.W.2d at 539.

---

8. Closely held corporations have unique attributes that may justify different protections under the law. We discuss these consider-

ations in Section III, *infra,* in our analysis of whether to recognize a common-law cause of action for oppression. We do not discuss

That same year, another court of appeals became the first Texas appellate court to affirm a judgment based on the statute's oppressive-actions provision. *Davis v. Sheerin,* 754 S.W.2d 375 (Tex. App.-Houston [1st Dist.] 1988, writ denied). In *Davis,* which has since become the seminal Texas opinion on the issue, a 45% owner of a closely held corporation, Sheerin, sued the company's president and 55% owner, Davis, alleging that Davis engaged in oppressive conduct and breached fiduciary duties owed to Sheerin and the company. *Id.* at 377. The jury agreed with Sheerin, and the trial court appointed a rehabilitative receiver and ordered Davis to buy out Sheerin's interest. *Id.* at 378. Although the court of appeals acknowledged that the statute does not expressly authorize a buy-out order and that no Texas court had previously forced a shareholder buyout in the absence of a buy-out agreement, *id.* at 378–79, it concluded that "Texas courts, under their general equity power, may decree a [buyout] in an appropriate case where less harsh remedies are inadequate to protect the rights of the parties." *Id.* at 380.

When determining what constitutes "oppressive" action under the statute, the *Davis* court concluded that "[c]ourts take an especially broad view of the application of oppressive conduct to a closely-held corporation, where oppression may more easily be found," *id.* at 381, and then recited two standards for oppression:

- a New York court's definition of oppression as occurring "when the majority's conduct substantially defeats the expectations that objectively viewed were both reasonable under the circumstances and were central to the minority shareholder's decision to join the venture," and

- an Oregon court's collection of oppression definitions, which included " 'burdensome, harsh and wrongful conduct,' 'a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members,' or 'a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.' "

*Id.* at 381–82. These two standards—generally referred to as the "reasonable expectations" test and the "fair dealing" test—have since echoed throughout Texas oppressive-actions cases.[9]

In the present case, the trial court used the fair dealing test to define "oppressive" for the jury. On appeal, the court of appeals concluded that the directors' refusal to meet with Rupe's potential purchasers was oppressive under both tests: it substantially defeated Rupe's reasonable expectations and constituted a "visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." 339 S.W.3d at 297. In addition, the court rejected the application of the business judgment rule, reasoning that the rule applies only in derivative suits and only to protect

them here because former article 7.05 and section 11.404 apply equally to all corporate forms, whether closely held or publicly traded, without distinction.

9. *See, e.g., Kohannim v. Katoli,* 440 S.W.3d 798, 811–13 (Tex.App.-El Paso 2013, pet. denied); *Boehringer v. Konkel,* 404 S.W.3d 18, 24 (Tex.App.-Houston [1st Dist.] 2013, no pet.); *Redmon v. Griffith,* 202 S.W.3d 225, 234 (Tex.App.-Tyler 2006, pet. denied); *Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 699–701 (Tex.App.-Fort Worth 2006, pet. denied); *Pinnacle Data Servs., Inc. v. Gillen,* 104 S.W.3d 188, 196 (Tex.App.-Texarkana 2003, no pet.); *Willis v. Bydalek,* 997 S.W.2d 798, 801 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

directors from individual liability. *Id.* at 295–96. The court thus affirmed the trial court's finding that Dennard, Ritchie, and Lutes had engaged in oppressive conduct. *Id.* at 309.

## B. The Meaning of "Oppressive" Under the Receiverhip Statute

The construction of former article 7.05, like any other statute, is a question of law for the courts, and we review the court of appeal's determination of this question de novo. *Atmos Energy Corp. v. Cities of Allen,* 353 S.W.3d 156, 160 (Tex. 2011). "Our task is to effectuate the Legislature's expressed intent," *In re Allen,* 366 S.W.3d 696, 703 (Tex.2012); it is not to impose our personal policy choices or "to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results." *Iliff v. Iliff,* 339 S.W.3d 74, 79 (Tex.2011) (quoting *McIntyre v. Ramirez,* 109 S.W.3d 741, 748 (Tex.2003)). We focus on the words of the statute, because "[l]egislative intent is best revealed in legislative language." *In re Office of Att'y Gen.,* 422 S.W.3d 623, 629 (Tex.2013).

We begin by noting that the Legislature has never defined the term "oppressive" in the Business Corporations Act or the Business Organizations Code. And although it has used the terms "oppress," "oppressive," or "oppression" in a handful of other Texas statutes, they do not include a definition either.[10] In the absence of a statutory definition, we give words their common meaning. *City of Dall. v. Abbott,* 304 S.W.3d 380, 393 (Tex.2010). Dictionary definitions of "oppression" include "[t]he act or an instance of unjustly exercising authority or power," "[c]oercion to enter into an illegal contract," and— reflective of case law addressing claims like Rupe's claim in this case—"[u]nfair treatment of minority shareholders (esp. in a close corporation) by the directors or those in control of the corporation." BLACK'S LAW DICTIONARY 1203 (9th ed.2009). As these definitions and the Legislature's other uses of the term demonstrate, "oppressive" is a broad term that can mean different things in different contexts. Under the other statutes, a government regulation, a subpoena, the amount of bail, the use of military or official authority, a franchise agreement, and a debt collector's actions can all be "oppressive."[11] Generally, these statutes indicate that "oppressive" actions involve an abuse of power that harms the rights or interests of another person or persons and disserves the

**10.** *See, e.g.,* TEX. BUS & COM.CODE § 2.614 (providing that payment in the manner required by a government regulation is sufficient to discharge a buyer's obligation "unless the regulation is discriminatory, oppressive or predatory."); *Id.* § 2A.404 (same for lease payments); TEX. CIV. PRAC. & REM.CODE § 22.024(2) (court may compel journalist to testify if, *inter alia,* "the subpoena is not overbroad, unreasonable, or oppressive"); TEX. CODE OF CRIM. PROC. art. 38.11 Sec. 5(b)(1) (subpoena may not be "overbroad, unreasonable, or oppressive"); *Id.* art. 17.15 ("The power to require bail is not to be so used as to make it an instrument of oppression."); TEX. FIN.CODE § 392.302(1) (listing conduct by which a debt collector "may not oppress, harass, or abuse a person"); TEX. GOV'T CODE § 432.138 (prohibiting military officers from "cruelty toward, or oppression or maltreatment of, any person subject to his order"); *Id.* § 665.052(4) (public officers may be removed for "oppression in office"); TEX. OCC.CODE § 2301.455 (auto dealer's franchise agreement may be terminated considering, *inter alia,* "oppression, adhesion, and the parties' relative bargaining power"); TEX. PENAL CODE § 1.02 (objective of Penal Code is to prevent "arbitrary or oppressive treatment of persons suspected, accused, or convicted"); *Id.* § 39.03 (defining "official oppression" as "intentionally" inflicting various harm on others).

**11.** *See* authorities cited *supra* note 10.

purpose for which the power is authorized. But the test for determining whether something is oppressive will necessarily vary from one context to the next, and thus the term has multiple meanings, depending on the circumstances.

■ "[W]hen an undefined [statutory] term has multiple common meanings, the definition most consistent within the context of the statute's scheme applies." *State v. $1,760. 00 in U.S. Currency,* 406 S.W.3d 177, 180–81 (Tex.2013) (per curiam). To determine the meaning of "oppressive" in the receivership statute, our text-based approach to statutory construction requires us to study the language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence. *In re Office of Att'y Gen.,* 422 S.W.3d at 629; *Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999). We therefore examine not only the language of the oppression provision but also the language and context of the entire receivership statute, including the other specific grounds on which it authorizes a receivership and the general requirements that apply to all of the specific grounds.

### 1. General Requirements for Receivership

The term "oppressive" in former article 7.05 occurs within a statute that authorizes courts to appoint a receiver to take over a corporation's governance, displacing those who are otherwise legally empowered to manage the corporation. Within this context, two aspects of this receivership statute are particularly relevant. First, both former article 7.05 and current section 11.404 are not limited to closely held corporations. *See* former art. 7.05; TEX. BUS. ORGS.CODE § 11.404. The Legislature has adopted a single standard for rehabilitative receivership based on oppressive actions

that applies to all corporations (and, under the current statute, any "domestic entity") without regard to the number of its shareholders or the marketability of its shares. *See id.* Nothing in the language suggests that this statute provides a special right or remedy unique to minority shareholders in closely held corporations. *See id.* We must thus construe the statute in a manner that is meaningful and workable not only for the peculiarities of minority shareholders in a closely held corporation, but also for shareholders and owners of other business entities.

■■ Second, the statute places significant restrictions on the availability of a receivership: (1) the receivership must be "necessary . . . to conserve the assets and business of the corporation and to avoid damage to parties at interest," (2) "all other requirements of law [must be] complied with," and (3) "all other remedies available either at law or in equity" must be "inadequate." Former art. 7.05(A) (emphasis added); *see also* TEX. BUS. ORGS. CODE § 11.404(b). These requirements demonstrate the Legislature's intent that receivership—which replaces the managers the shareholders chose with the courts' chosen managers—is a "harsh" remedy that is not readily available. *See Balias,* 748 S.W.2d at 257. In fact, by requiring termination of the receivership immediately after the condition that necessitated the receiver is remedied, the Legislature has expressed its intent that receivership be a temporary fix for exigent circumstances. *See* former art. 7.05(B); *see also* TEX. BUS. ORGS.CODE § 11.404(c). We thus agree with the *Balias* court that, to qualify as the type of "oppressive" actions that justify a rehabilitative receivership, the complained-of actions must create exigent circumstances for the corporation. *See Balias,* 748 S.W.2d at 257.

### 2. Other Grounds for Receivership

In addition to the statute's three general requirements, a shareholder who seeks a rehabilitative receivership under former article 7.05 must also prove at least one of five specific grounds, one of which is the "illegal, oppressive or fraudulent" actions provision on which Rupe relies. *See* former art. 7.05(A)(1)(c); *see also* Tex. Bus. Orgs.Code § 11.404(a)(1)(C). The other four specific grounds are (1) the corporation is insolvent or in imminent danger of becoming insolvent; (2) an unbreakable deadlock among the corporation's managers is causing or threatening irreparable injury to the corporation; (3) a deadlock among the shareholders prevents the election of the corporation's management; or (4) the corporation's assets are being misapplied or wasted. Former art. 7.05(A)(1)(a), (b), (d), (e); *see also* Tex. Bus. Orgs.Code § 11.404(a)(1)(A), (B), (D), (E). These are all situations that pose a serious threat to the well-being of the corporation. We must construe "illegal, oppressive, or fraudulent" actions, when alleged as a ground for receivership, in a manner consistent with these types of situations. *See, e.g., R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 629 (Tex.2011) (construing "public interest" to reference only public interest in natural resources, not public interest in traffic safety, when other con-siderations identified in statute exclusively concerned matters relating to oil and gas).

### 2. "Illegal, Oppressive, or Fraudulent" Actions

Finally, we consider the statute's specific provision, which requires a finding that the "directors or those in control of the corporation" engaged in "illegal, oppressive, or fraudulent" actions. This requirement provides two more essential pieces of guidance. First, receivership under this provision must be based on the actions of the corporation's "directors or those in control of the corporation." *See* former art. 7.05(A)(1)(c); *see also* Tex. Bus. Orgs.Code § 11.404(a)(1)(C) ("governing persons").[12] Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty "includes the dedication of [their] uncorrupted business judgment for the sole benefit of the corporation." *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 577 (Tex.1963); *see also Gearhart Indus., Inc. v. Smith Intern., Inc.,* 741 F.2d 707, 723–24 (5th Cir.1984) (describing corporate director's fiduciary duties of obedience, loyalty, and due care). Since the statute permits a receivership only for the "oppressive" actions of those who are duty-bound to act according to their "uncorrupted business judgment for the sole benefit of the corporation," the meaning of "oppressive" must accommo-

---

12. Ordinarily, a corporation must be managed by a board of directors. Tex. Bus. Orgs. Code § 21.401(a). The Business Organizations Code allows certain exceptions, including when the shareholders' agreement or the governing documents of a "close corporation" provide for the elimination of the board of directors in favor or one or more corporate managers. *Id.* §§ 21.101(a)(2), 21.713(2). Under these circumstances, corporations may be managed directly by shareholders. *See id.* §§ 21.101(a)(2), 21.714(b)(1), (2). Thus, former article 7.05 and current section 11.404 authorize receivership based on the conduct of a corporation's directors (when the corporation is managed by a board of directors) or of its shareholders (when the corporation is managed by its shareholders). *See* former art. 7.05(A)(1)(c); Tex. Bus. Orgs.Code § 11.404(a)(1)(C). In either instance, however, the persons or entities managing the corporation act in the capacity of directors and are treated as directors under the Code. Tex. Bus. Orgs.Code §§ 21.106(a)–(b), 21.725–.726(a); *see also id.* § 21.727 (managing shareholders subject to liability imposed on directors for management-related conduct required by law).

date the exercise of that business judgment. In other words, because a director is duty-bound to exercise business judgment for the sole benefit of the corporation, and not for the benefit of individual shareholders, we cannot construe the term "oppressive" in a manner that ignores that duty. *See, e.g., Holloway,* 368 S.W.2d at 577–78 (describing corporate officers' and directors' duty to maximize corporate returns and value of corporation's shares); *Hughes v. Hous. Nw. Med. Ctr., Inc.,* 680 S.W.2d 838, 843 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (observing that corporate officers and directors owe corporation and its collective shareholders "a duty to act only in their best interest"). We therefore reject the court of appeals' conclusion that the business judgment rule "has no application in this case." 339 S.W.3d at 296. Instead, we agree with the *Texarkana College Bowl* court's conclusion that conduct is oppressive only if it is "inconsistent with the honest exercise of business judgment and discretion by the board of directors."[13] *Texarkana Coll. Bowl,* 408 S.W.2d at 539; *see also Willis,* 997 S.W.2d at 802–03.

■ Second, the Legislature grouped together three categories of conduct in this provision of the statute—actions that are "illegal," actions that are "fraudulent," and actions that are "oppressive." *See* former art. 7.05(A)(1)(c); *see also* TEX. BUS. ORGS. CODE § 11.404(a)(1)(C). It is a "familiar principle of statutory construction that words grouped in a list should be given related meaning," *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 n. 2 (Tex.1980), and similarly that "the meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute." *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003). Thus, the meaning that the Legislature contemplated for the term "oppressive" must be consistent with, though not identical to, the meanings intended for the accompanying terms "illegal" and "fraudulent."

Illegal and fraudulent actions in corporate management share considerable similarities and in some circumstances overlap—fraud generally is itself "illegal," and may subject the actor to criminal liability. *See, e.g.,* TEX. PENAL CODE, ch. 32 (fraud), ch. 35 (insurance fraud), ch. 37 (perjury and other falsification). Fraudulent and illegal actions in this context pose a danger to the corporation itself. Fraudulent or illegal actions by a corporation's directors may result in disregard of the corporate form, *see, e.g.,* TEX. BUS. ORGS.CODE § 21.223(b); may vitiate the corporation's contractual interests, *see Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 179 (Tex.1997); and may even result in an involuntary judicial termination of the corporation, *see* TEX. BUS. ORGS.CODE § 11.301(a)(2), (5). We must construe the third of these terms—"oppressive"—in a

---

**13.** The dissent states that "the business judgment rule is fundamentally at odds with shareholder oppression remedies." *Post* at 903. But our task is not to construe the receivership statute in a manner that is consistent with "shareholder oppression remedies," a phrase that cannot be found in any prior Texas opinion. Our task is to construe the statute in a manner that is consistent with statutory language enacted by the Legislature. The business judgment rule is entirely consis-

tent with the language of the statute, which authorizes relief only if necessary "to conserve the property and business of the domestic entity and avoid damage to interested parties," and it is entirely consistent with the surrounding grounds for relief under the statute, which focus on insolvency, deadlock in the management of the business, and misuse of business property—i.e., conduct that threatens the interests of the business. *See* former art. 7.05(A)(1)(a), (b), (d), (e); TEX. BUS. ORGS.CODE § 11.404(a)(1)(A), (B), (D), (E).

manner consistent with the severity of these concepts.

### 4. The Meaning of "Oppressive"

██ Considering the language and context of the statute, we have identified at least three characteristics of "actions" that the statute refers to as "oppressive": (1) the actions justify the harsh, temporary remedy of a rehabilitative receivership; (2) the actions are severe and create exigent circumstances; and (3) the actions are inconsistent with the directors' duty to exercise their honest business judgment for the benefit of the corporation. The term's common meaning and its usage in other statutes add a fourth characteristic: the actions involve an unjust exercise or abuse of power that harms the rights or interests of persons subject to the actor's authority and disserves the purpose for which the power is authorized.[14] Actions that uniformly affect all shareholders typically will not satisfy this aspect of the term's meaning because, collectively, the shareholders of a business are not at the mercy of the business's directors.[15]

In light of these considerations, we conclude that neither the "fair dealing" test nor the "reasonable expectations" test sufficiently captures the Legislature's intended meaning of "oppressive" actions in former article 7.05.[16] As to the "fair dealing" test, we agree that a "lack of probity and fair dealing" and "a visible departure from the standards of fair dealing and [a] violation of fair play" may be aspects of actions that are "oppressive," and we agree that the actions must be "burdensome, harsh and wrongful." And as to the "reasonable expectations" test, we agree that oppressive actions will defeat the reasonable expectations that were central to the shareholder's decision to join the venture. But in light of the language and context of the statute and the term's common meaning and other uses, we cannot accept a definition that would find oppression on either of

---

14. *See* authorities cited *supra* note 10; *see also* TEX. CONST. art. XV, § 8 (providing for removal of judges for oppression in office); TEX. PENAL CODE § 39.03 (oppression by a public official); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 103 (Tex.2011) (Jefferson, C.J., joined by JJ. Wainwright and Lehrmann, concurring) (observing duty of courts and legislature to protect litigants from "crippling burdens oppressive discovery imposes"); *State v. Coca Cola Bottling Co. of Sw.*, 697 S.W.2d 677, 679 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.) (observing that state antitrust statutes are designed to "suppress trusts, secure the benefits arising from competition in trade, prevent monopolies, and protect the people from the possible tyranny and oppression of combined wealth") (citing *Monopolies, Etc.* 54 Am.Jur.2d § 452 (1971)).

15. Thus, actions that are "oppressive" under the statute ordinarily will not give rise to derivative suits. In other words, shareholders may not use a claim under the oppression provision of the receivership statute as an

end-run around the Legislature's detailed rules and procedures for derivative actions.

16. The dissent contends that the "Legislature has acquiesced" in "the long-standing definition of oppression that has existed at the common-law in Texas and a host of other jurisdictions," *post* at 897, the development of which it attributes primarily to New York courts, *post* at 897. With respect to the first contention, we note that this Court has consistently refused to rely on "legislative acquiescence" as a doctrine of statutory construction when it runs contrary to the plain language of the statute. *See, e.g., Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 914–15 (Tex.2004) (rejecting argument based on legislative acquiescence because "neither legislative ratification nor judicial deference to an administrative interpretation can work a contradiction of plain statutory language."). With respect to the second, we have discussed above the meaningful differences between New York's statute relating to oppressive conduct, which applies only to closely held corporations, and Texas's stat-

these bases alone, and we disapprove of the court of appeals decisions that have.[17]

Considering all of the indicators of the Legislature's intent, we conclude that a corporation's directors or managers engage in "oppressive" actions under former article 7.05 and section 11.404 when they abuse their authority over the corporation with the intent to harm the interests of one or more of the shareholders, in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the corporation.

### 5. Application to Rupe

■■■ Applying the Legislature's intended meaning, we conclude that the refusal by Dennard, Ritchie, and Lutes to meet with Rupe's potential buyers does not constitute an "oppressive" action for which Rupe may obtain relief under former article 7.05. Dennard, Ritchie, and Lutes had no contractual, statutory, or other duty to meet with prospective buyers. Rupe does not dispute that they sought and received the advice of an outside attorney who had expertise in securities law before making that decision, and they declined to participate in the meetings because doing so would increase the risk of suit against RIC and its directors in the event of a dissatis-

fied purchaser.[18] Moreover, the evidence does not support a finding that they abused their authority with the intent to harm Rupe's interests in RIC, or that their decision created a serious risk of harm to RIC. In the absence of such evidence, we conclude that their refusal to meet with prospective buyers was not "oppressive" as that term is used in the receivership statute.

Undoubtedly, the directors' refusal to meet with prospective purchasers placed Rupe in a difficult situation that prevented her from selling her shares as quickly as she wanted and for their full value. But difficulty in—and sometimes even the impossibility of—selling one's shares is a characteristic intrinsic to ownership of a closely held corporation, the shares of which are not publicly traded. Shareholders of closely held corporations may address and resolve such difficulties by entering into shareholder agreements that contain buy-sell, first refusal, or redemption provisions that reflect their mutual expectations and agreements. In the absence of such agreements, however, former article 7.05 authorizes the appointment of a receiver only for specific conduct—in this case, allegedly oppressive actions—and the conduct relied on by the court of appeals here does not meet that standard.[19]

---

ute, which applies to all domestic business entities.

17. *See, e.g., Kohannim v. Katoli,* 440 S.W.3d at 811–13; *Boehringer,* 404 S.W.3d at 24; *Redmon,* 202 S.W.3d at 234; *Cotten,* 187 S.W.3d at 699–701; *Pinnacle Data,* 104 S.W.3d at 196; *Willis,* 997 S.W.2d at 801; *Davis,* 754 S.W.2d at 382.

18. As several amici noted in their briefs to this Court, by providing information to Rupe's prospective purchasers the directors would have placed RIC and themselves at risk of liability for making misleading "statements" under state and federal securities laws. *See* Tex.Rev.Civ. Stat. art. 581–33(A) (imposing liability for misrepresentation or omissions of

material facts by one who offers or sells a security); 17 C.F.R. § 240.10b–5 (imposing similar liability under federal law).

19. Because this is the first time this Court has addressed the meaning of the term "oppressive" in the receivership statute, we would ordinarily consider remanding the case for a new trial under the new legal standard that we have announced. *See, e.g., Natural Gas Pipeline Co. of Am. v. Justiss,* 397 S.W.3d 150, 162 (Tex.2013) (remanding case in the interest of justice for new trial under newly announced legal standard). In light of our next holding that the statute does not authorize courts to grant the relief that Rupe obtained, however, we need not consider that option here.

## C. Statutory Remedy

■ Although the court of appeals relied exclusively on the directors' decision not to meet with potential buyers of Rupe's shares, Rupe asserted that other actions by Dennard, Ritchie, and Lutes also constituted "oppressive" conduct under former article 7.05. We need not consider whether any or all of these other actions were oppressive, however, because we hold that, even if they were, the statute does not authorize the buy-out remedy that Rupe sought and obtained, and Rupe did not request the rehabilitative-receivership remedy that the statute does authorize.[20]

Former article 7.05 creates a single cause of action with a single remedy: an action for appointment of a rehabilitative receiver. *See* former art. 7.05; *see also* TEX. BUS. ORGS.CODE § 11.404. It identifies:

● to whom the cause of action is available: shareholders and creditors;[21]

● the remedy available: "[a] receiver may be appointed for the assets and business of a corporation."[22]

● the grounds on which each type of claimant may seek the remedy;[23] and

the requirements a claimant must satisfy to obtain the remedy:

● the appointment of a receiver must be necessary "to conserve the assets and business of the corporation and to avoid damage to parties at interest,"

● "all other requirements of law are complied with," and

● "all other remedies available either at law or in equity ... are determined by the court to be inadequate."[24]

The court of appeals relied on the statute's third requirement—a finding that all other remedies available at law or in equity are inadequate—to hold that the statute authorizes not only the appointment of a receiver but also any other appropriate equitable relief. 339 S.W.3d at 286. We disagree. Subsection (A) of former article 7.05, like subsection (b) of current section 11.404, identifies the inadequacy of other legal and equitable remedies as a prerequisite to the appointment of a receiver. *See* former art. 7.05(A); TEX. BUS. ORGS.CODE § 11.404(b). This provision is a restriction on the availability of receivership, not an expansion of the remedies that the statute authorizes.[25] It is consistent with the ex-

**20.** Rupe requested appointment of a receiver as an alternative remedy in the trial court. But she only sought a liquidating receiver, not a rehabilitative receiver. A liquidating receiver is available under former article 7.06, but not 7.05. *See Mueller v. Beamalloy, Inc.,* 994 S.W.2d 855, 860–61 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (distinguishing rehabilitative receivership of article 7.05 from liquidating receivership of article 7.06). Oppressive actions are not a ground for appointment of a liquidating receiver under 7.06, and Rupe did not submit the elements necessary for a liquidating receiver to the jury.

**21.** Former art. 7.05(A)(1), (2) (shareholder or creditor); *see* TEX. BUS. ORGS.CODE § 11.404(a)(1), (2).

**22.** Former art. 7.05(A); *see* TEX. BUS. ORGS. CODE § 11.404(b)(1)–(3).

**23.** Former art. 7.05(A)(1)(a)–(e) (grounds for shareholder), (A)(2)(a)–(b) (grounds for creditor); *see* TEX. BUS. ORGS.CODE § 11.404(a)(1)(A)–(E), (2)(A)–(B).

**24.** Former art. 7.05(A); *see* TEX. BUS. ORGS. CODE § 11.404(b)(1)–(3).

**25.** The dissent reaches a contrary conclusion based, in part, on broad assertions about the holdings of courts in other jurisdictions, and suggests that our holdings in this case contradict the holdings of most other states. *See, e.g., ante* at 868. But we must construe the Texas statute, and it differs from the statutes in those other states. In particular, the dissent points to the Model Business Corporation Act, which it asserts served as the basis of the Texas receivership statute, and the Illinois statute, which it asserts served as the basis of

traordinary nature of receivership and is a common prerequisite for other extraordinary forms of relief. *See, e.g., In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex.2004) (mandamus is extraordinary writ available only when remedy by appeal is inadequate); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 210 (Tex.2002) (to obtain injunction under court's equitable powers, party must prove inadequacy of all remedies available at law).

Unlike the statute, which authorizes only a receivership, common-law causes of action, particularly those that invoke a court's equitable powers, often support a variety of remedies, and the same may be true of other statutes that authorize receivership. *See, e.g.,* TEX. BUS. & COM.CODE § 24.008(a)(3) (authorizing appointment of a receiver among types of equitable relief available for fraudulent transfer). Additionally, as discussed later in this opinion, the kinds of actions that support a shareholder action for receivership under the "oppressive" prong of the statute are the kinds of conduct that also may support other causes of action, such as fraud or breach-of-fiduciary-duties to the corporation. *See* former art. 7.05(A); TEX. BUS. ORGS.CODE § 11.404(a). Finally, the stat-

---

the model act. But a comparison of the language of the Texas statute to the language of the model act and the Illinois statute only confirms our construction of the Texas statute, rather than the dissent's.

The model act, for example, does not allow for appointment of a rehabilitative receiver based on oppressive actions. *See* Model Business Corporation Act § 7.48. In fact, it does not provide for *any* consideration of an individual shareholder's interests in determining whether to appoint a receiver. *Id.* § 7.48(a) (authorizing appointment of a custodian or receiver only when a shareholder establishes that the corporation's "directors are deadlocked" and "irreparable injury to the corporation is threatened or being suffered" or that "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered"). Instead, under the model act, oppressive actions will only support a claim for dissolution of the corporation, and only if it is a closely held corporation. *See id.* § 14.30(a)(2)(ii), (b). *Compare* TEX. BUS. & COM.CODE § 11.404, *with* Model Business Corporation Act § 14.30(a)(2)(ii), (b); *post* at 895 (stating that "36 states in all appear to allow liquidation for oppressive or similar conduct"). We thus construe the Texas statute in a manner that is consistent with the less severe but more generally available remedy it authorizes for oppressive actions.

More importantly, the model act, unlike the Texas statute, *expressly authorizes* a buy-out option as an alternative to dissolution based on oppressive actions, but only if the corporation or one or more of its shareholders elects that option. Model Business Corporation Act § 14.34(a). Because the model act expressly authorizes a buyout, we cannot rely on it to find such a remedy in the Texas statute, which does not. And even if we could, it would provide no basis to hold that courts may order a buyout against the wishes of the corporation and its remaining shareholders.

Like the model act, but unlike the Texas statute, the Illinois statute creating a remedy for oppressive actions is limited to shareholders in corporations that are not publicly traded. *Compare* 805 ILL. COMP. STAT. 5/12.55 (shareholder remedies in public corporations), *with* 805 ILL. COMP. STAT. 5/12.56 (shareholder remedies in non-public corporations). And unlike the Texas statute, the Illinois statute *expressly authorizes* a broad array of remedies, including the removal of an officer or director, the appointment of a custodian, the payment of dividends, the award of damages, and "[t]he purchase by the corporation or one or more other shareholders of all, but not less than all, of the shares of the petitioning shareholder." *Id.* § 5/12.56(b). Thus, the Illinois legislature did exactly what the Texas legislature chose not to do: it expressly authorized, by statute, additional remedies beyond appointment of a receiver, including judicially mandated buyouts. *See* 805 ILL. COMP. STAT. 5/12.55(b)(11). We cannot rely on another state's statute, which expressly authorizes certain remedies, as a basis for construing our statute, which does not expressly authorize those remedies, as if it does. To the contrary, the Illinois statute demonstrates how the Texas legislature could have statutorily authorized alternative remedies, but it did not.

**874**

ute itself contemplates other, less harsh, relief that may be available under other provisions of the statute, such as the appointment of a receiver only over specific corporate assets rather than a receivership over the whole corporation. *See* former art. 7.05(A); TEX. BUS. ORGS.CODE § 11.404(b)(3).

■■■ The statute thus recognizes that in many circumstances relief other than appointment of a receiver may be avail-

able, and it requires courts to consider such relief before appointing a rehabilitative receiver. *See* former art. 7.05(A); TEX. BUS. ORGS.CODE § 11.404(b)(3). If lesser remedies [26] are available under either the common law or other statutory provisions, and those remedies are adequate, the Court cannot appoint a rehabilitative receiver. *See id.* Here, for example, the jury found in Rupe's favor on her breach-of-fiduciary-duty claim.[27] Before

26. The dissent's focus on the availability of "lesser remedies" assumes, without analysis, that the trial court's buy-out order is a "lesser remedy" than appointment of a rehabilitative receiver. But that contention is disputed in this case. Dennard, Rupe, and Lutes have argued that the trial court's buy-out order was an "unduly harsh 'remedy' that will force RIC to sell and/or leverage corporate assets to scrape together over $7.3 million for [Ritchie's] stock," which would bring RIC "to its knees" and place it "at risk of bankruptcy." 339 S.W.3d at 298 (not analyzing this argument under the "lesser remedies" language in the statute).

Commentators also have recognized that court-ordered buyouts can threaten the financial security of closely held entities, even pushing them into bankruptcy or dissolution. *See, e.g.*, Lydia Rogers, *The Bankruptcy Implications of A Court–Ordered Buyout for Shareholder Oppression: Is It A Remedy at All?*, 64 BAYLOR L. REV. 594, 604 (2012) ("The reality is that a court-ordered buyout judgment could force closely held corporations to declare bankruptcy. Buyout judgments, even after discounts, can easily exceed one million dollars. Such an amount is not likely to be readily available to a closely held corporation, and after a judgment, it would be unlikely that the corporation would be able to obtain outside financing to pay the debt."); Edward B. Rock & Michael L. Wachter, *Waiting for the Omelet to Set: Match–Specific Assets and Minority Oppression in Close Corporations*, 24 J. CORP. L. 913, 920 (1999) (noting that, particularly in the context of close corporations, readily available "dissolution or buyout increase the risk of bankruptcy, thereby reducing the creditworthiness of the company"); 1 F. Hodge O'Neal & Robert B. Thompson, O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 1:4, at 1–7 n. 2 (rev.2d

ed. 2005) ("In discussing a minority shareholder suit which eventually led to the bankruptcy of the corporation, a Pennsylvania attorney noted: 'No responsible bank would extend credit to a close[ ] corporation embroiled in a shareholder controversy. Without credit, most such corporations simply die.' " (quoting Letter to author, June 15, 1981)).

27. The dissent states, "The Court's logic in applying the business judgment rule in this context would presumably also apply to minority shareholder claims for breach of fiduciary duty." *Post* at 897. We see no basis for such an assumption and note that Texas law recognizes different kinds of fiduciary duties owed under different circumstances. *See, e.g., Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex.2005) (discussing formal and informal fiduciary duties). The fiduciary duty alleged in this case is an informal fiduciary duty between Rupe and Dennard, Ritche, and Lutes. Informal fiduciary duties "arise from 'a moral, social, domestic, or purely personal relationship of trust and confidence.' " *Id.* at 331 (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). Informal fiduciary duties are not owed in business transactions unless the special relationship of trust and confidence existed prior to, and apart from, the transaction(s) at issue in the case. *Id.* (quoting *Associated Indem.*, 964 S.W.2d at 288). This Court has never applied the business judgment rule to informal fiduciary duties before; no party argues that we should do so in this case; and because such duties arise separate and apart from business relationships, we see no reason to assume that the rule would apply.

With regard to formal fiduciary duties, this Court has never recognized a formal fiduciary duty between majority and minority share-

granting a receivership under the statute, the trial court was required to determine whether Rupe was entitled to remedies for breach of fiduciary duty based on the jury verdict and if so, whether those remedies were adequate; it did neither.[28] But the statute does not create a cause of action for unspecified lesser remedies that are not otherwise available under the law; the only cause of action the statute creates is for receivership. We cannot turn the stat-ute's "all other ... remedies" language on its head—treating it as expanding rather than restricting the relief the statute provides—and we need not do so to give the language meaning. Instead, the statute provides only the remedy it identifies—rehabilitative receivership—and it restricts the availability of that relief to circumstances where the trial court has determined that "all other available legal and equitable remedies ... are inadequate."[29]

holders in a closely-held corporation, *see Willis v. Donnelly*, 199 S.W.3d 262, 276–77 (Tex. 2006), and no party has asked us to do so here. This Court has recognized a fiduciary duty owed by corporate officers and directors to the corporation, which prohibits officer and directors from usurping corporate opportunities for personal gain and requires them to exercise their "uncorrupted business judgment for the sole benefit of the corporation." *Int'l Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 576–77 (Tex.1963); *see also Redmon*, 202 S.W.3d at 233 (noting that officers' and directors' formal fiduciary duty is owed to the corporation and its shareholders collectively, not to individual shareholder interests); *Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (same); *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex.App.-Fort Worth 2011, no pet.) (same); *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, pet. denied) (same). No party in this case has asked us to alter the nature of that duty.

28. The dissent contends that in this opinion we "abolish," "foreclose," and "extinguish" the lesser remedies preferred by the statute. *Post* at 893, 890, 897. But we have not abolished or even limited the remedies available under the common law or other statutes for the kinds of conduct that give rise to rehabilitative receivership actions, whether under the oppressive-actions prong or other prongs. As we discuss in some detail in Part III of this opinion, the actions that give rise to oppressive-action receivership claims typically also give rise to common-law claims as well, opening the door to a wide array of legal and equitable remedies not available under the receivership statute alone. Those remedies, whether lesser or greater, are not displaced by the rehabilitative receivership statute, which merely adds another potential remedy available in extraordinary circumstances when lesser remedies are inadequate. This very case underscores this point, demonstrating that lesser remedies may remain available as an alternative to receivership in Texas law. We have remanded this case to the court of appeals to consider whether Rupe is entitled to the buyout ordered by the trial court based on her successful breach-of-fiduciary-duty claim. If Rupe prevails on remand, she may obtain the very remedy the dissent says we have abolished.

29. The dissent contends that we have "effectively rewritt[en] the statute" and rendered the limiting language in subsection (b) of the statute "meaningless" by failing to construe it as impliedly creating new, independent statutory authority to award a broad array of equitable remedies, including a court-ordered stock buyout, and that this "defeats the very purpose of the Legislature's carefully chosen words." *Post* at 898. But the "carefully chosen words" of subsection (b) are limiting, rather than expansive, in nature: a "court may appoint a receiver under Subsection (a) *only if:* ... the court determines that all other available legal remedies and equitable remedies, including the appointment of a receiver for specific property of the domestic entity under Section 11.404(a), are inadequate." Tex. Bus. & Com.Code § 11.404(b)(3) (emphasis added). We give those words their plain meaning—limiting the authority of a trial court to grant a rehabilitative receiver under subsection (a) *only if* certain requirements are met. *See id.* This serves the legislative purpose expressed in the statute, which is to preclude the appointment of a receiver if other lesser remedies available under the common law or other statutes (expressly including section 11.404) are adequate.

Importantly, the dissent's attacks underscore the flaws in its own proposed construc-

Former art. 7.05(A); *see also* Tex. Bus. Orgs.Code § 11.404(b).

In affirming the trial court's buy-out order, the court of appeals relied on this Court's decision in *Patton v. Nicholas*, 154 Tex. 385, 279 S.W.2d 848 (1955). But *Patton* involved neither a claim for oppression nor a court-ordered buyout of stock. *Id.* at 849–59. Rather, this Court held in *Patton* that the receivership statute in effect at the time, former article 2293,[30] did not displace Texas courts' power to appoint a receiver as an equitable remedy for existing causes of action (there, a breach of the corporate trust) in "extreme" circumstances. *Id.* at 856–57.[31] Former article 2293, like former article 7.05 and current section 11.404, expressly preserved the availability of receivership as an equitable remedy for a cause of action that invokes the courts' equitable powers. *See* former art. 2293, para. 4; former art. 7.05(A)(3); Tex. Bus. Orgs.Code § 11.404(a)(3). Our recognition in *Patton* that the statutory action for receivership did not displace Texas courts' historical power to grant receivership as an equitable remedy under a common-law cause of action does not support the court's construction of former article 7.05 to provide a different statutory remedy, a buyout, without regard to any common-law cause of action.

■■■■ The court of appeals also relied on *Davis* to support the availability of a buy-out order under the statute. 339 S.W.3d at 286–87 (citing *Davis*, 754 S.W.2d at 378–80). *Davis* likewise relied on *Patton*. Both courts' reliance on *Patton* is misplaced, and we reject the holding in *Davis* that former article 7.05 authorizes Texas courts to invoke their "general equity power" to award a buyout of stock as a remedy for oppressive actions under the statute (rather than under a common-law cause of action for which equitable remedies are otherwise available). *Cf. Davis*, 754 S.W.2d at 379; *see also ARGO Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 265 (Tex.App.-Dallas 2012, pet. filed) ("The statute authorizes the court to fashion an equitable remedy if the actions of those in control of a corporation are illegal, oppressive, or fraudulent."). Although the Legislature has made a broad range of equitable remedies available for violations of other statutory causes of action, *see, e.g.,* Tex.

---

tion of the statute. It asks this Court to ignore the words of the statute, which authorize courts to "appoint a receiver ... only if ... all other *available* legal and equitable remedies ... are inadequate," *id.* § 11.404(b)(3), and instead rewrite the statute to authorize courts to "appoint a receiver or grant any other legal or equitable remedy of any kind, whether otherwise available or not."

**30.** *See* Act of April 2, 1887, 20th Leg., R.S., ch. 131, § 1, 1887 Tex. Gen. Laws 119, 119–22, *amended by* Act of March 19, 1889, 21st Leg., R.S., ch. 59, § 1, 1889 Tex. Gen. Laws 55, 55–58 (former Tex.Rev.Civ. Stat. art. 2293), *repealed by* Act of May 17, 1985, 69th Leg., R.S. ch. 959, § 9(1), 1985 Tex. Gen. Laws [herein, "former article 2293"].

**31.** The cases upon which the Court relied in *Patton* to recognize that the "malicious suppression of dividends" was a wrong in the nature of a breach of fiduciary duty indicate that the Court viewed the wrong as a breach of the formal fiduciary duty owed by corporate officers and directors to the corporation. *See Patton*, 279 S.W.2d at 854 (citing *Becker v. Dirs. of Gulf City St. Ry. & Real–Estate Co.*, 80 Tex. 475, 15 S.W. 1094 (1891) and *Cates v. Sparkman*, 73 Tex. 619, 11 S.W. 846 (1889)); *see also Becker*, 15 S.W. at 1095–97 (reversing dismissal of suit for receivership brought by shareholders on behalf of company, alleging company's controllers formed competitor business, fraudulently transferred company's assets to competitor owned by controllers, then consolidated company into competitor); *Cates*, 11 S.W. at 848–50 (affirming dismissal of shareholder's claim against company's controller for devaluation of shares brought by shareholder individually because right of action belonged to corporation).

Bus. & Com.Code § 24.008(a)(3), it has not done so here. The Legislature provided a single remedy for oppressive actions under former article 7.05: appointment of a rehabilitative receiver.[32]

## D. Conclusion on Statutory Oppressive Actions

We hold that the decision by Ritchie, Dennard, and Lutes not to meet with Rupe's prospective buyers does not constitute "oppressive" action under former article 7.05, and the court of appeals erred in concluding otherwise. We also hold that appointment of a rehabilitative receiver is the only remedy that former article 7.05 authorizes for oppressive actions. Because the trial court's judgment does not appoint a receiver, we need not consider the other conduct that Rupe alleged was "oppressive."

## III.

## A Common-law Cause of Action for Shareholder Oppression?

■ This Court has never recognized a common-law cause of action for "minority shareholder oppression." Although the courts of appeals' opinions in this case and in *Davis* both addressed only actions for oppressive actions under the receivership statute, other parties and Texas courts have relied on these opinions to recognize a common-law claim for "shareholder oppression" not based on any statutory authority.[33] When asked in oral argument to identify the source of the directors' alleged duty in this case, Rupe's attorney asserted only that the duty "flows from the statute" and "derives from the word oppression in the statute." But because Rupe's pleadings and briefs also assert a common-law claim for shareholder oppression, we must

32. We need not decide in this case whether a trial court could properly appoint a rehabilitative receiver and authorize or order the receiver to implement a buyout of a shareholder's interests. Under section 11.406, a receiver has "the powers and duties that are stated in the order appointing the receiver" (as that order may be amended over time), and "the powers and duties provided by other laws applicable to receivers." Tex. Bus. Orgs. Code § 11.406(a)(4), (5). The primary "other laws" applicable to receivers subject their power "to the control of the court" and to actions "authorized by the court," Tex. Bus. & Com.Code § 64.031, and provides that "the rules of equity govern all matters relating to the appointment, powers, duties, and liabilities of a receiver and to the powers of a court regarding a receiver." *Id.* § 64.004. Thus, "[a] receiver has only that authority conferred by the Court's order appointing him," but, "[t]he order itself must comply with the statute authorizing such appointment." *Ex parte Hodges*, 625 S.W.2d 304, 306 (Tex.1981) (because statute did not authorize court to empower receiver to supplement or issue court orders, party's failure to comply with receiver's order could not be basis for contempt). Section 11.404 authorizes the courts to ap-

point a rehabilitative receiver "to conserve the property and business of the domestic entity and avoid damage to interested parties." Tex. Bus. Orgs.Code § 11.404(b)(1). An order authorizing or requiring a receiver to buy out a shareholder's interests would be authorized and proper under the statute only if the buyout would both "avoid damage to [an] interested part[y]" and "conserve the property and business of the domestic entity." If the buyout would help the shareholder but hurt the corporation, an order authorizing the receiver to effectuate the buyout would likely not comply with the statute authorizing the appointment. We need not resolve this question here, however, because Rupe did not seek or obtain an order authorizing a rehabilitative receiver to cause RIC to purchase her shares. In fact, Rupe did not seek a rehabilitative receiver at all.

33. *See, e.g., Cardiac Perfusion Servs., Inc. v. Hughes*, 380 S.W.3d 198, 202 (Tex.App.-Dallas 2012, pet. filed); *Boehringer*, 404 S.W.3d at 32–33; *Redmon*, 202 S.W.3d at 225, 233; *Cotten*, 187 S.W.3d at 699–701; *Gonzalez*, 181 S.W.3d at 392 n. 5; *Pinnacle Data Servs.*, 104 S.W.3d at 192; *Willis*, 997 S.W.2d at 803.

decide whether to recognize such a common-law cause of action under Texas law.

■■■■ When deciding whether to recognize "a new cause of action and the accompanying expansion of duty," this Court "perform[s] something akin to a cost-benefit analysis to assure that this expansion of liability is justified." *Roberts v. Williamson*, 111 S.W.3d 113, 118 (Tex. 2003). The analysis is complex, requiring consideration of a number of non-dispositive factors including, but not limited to:

- the foreseeability, likelihood, and magnitude of the risk of injury,
- the existence and adequacy of other protections against the risk,
- the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the persons in question, and
- the consequences of imposing the new duty, including
  - whether Texas's public policies are served or disserved
  - whether the new duty may upset legislative balancing-of-interests, and
  - the extent to which the new duty provides clear standards of conduct so as to deter undesirable conduct without impeding desirable conduct or unduly restricting freedoms.

*See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 410 (Tex.2009); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 193 (Tex.2004); *Thapar v. Zezulka*, 994 S.W.2d 635, 639–40 (Tex. 1999); *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994); *Graff v. Beard*, 858 S.W.2d 918, 920–21 (Tex.1993). Carefully considering these factors within the context of this case, we decline to recognize a new common-law cause of action for "minority shareholder oppression" in closely held corporations.

## A. Foreseeability, Likelihood, and Magnitude of Potential Injury

■■■■ By definition, a "closely held" corporation [34] is owned by a small number of shareholders whose shares are not publicly traded.[35] Often, these shareholders enjoy personal relationships as friends or family members in addition to their business relationship.[36] Sometimes, they enter into shareholder agreements to define things like their respective management and voting powers, the apportionment of losses and profits, the payment of dividends, and their rights to buy or sell their shares from or to each other, the corporation, or an outside party. Occasionally, things don't work out as planned: shareholders die, businesses struggle, relationships change, and disputes arise. When, as in this case, there is no shareholders' agree-

---

**34.** The Texas Business Organizations Code distinguishes between "closely held corporations" and "close corporations." The Code defines a "closely held corporation" as a corporation that is privately owned (i.e., not publicly traded) by fewer than 35 shareholders. *See* Tex. Bus. Orgs.Code § 21.563(a); *see also id.* § 101.463 (closely held LLCs). By contrast, the Code allows all corporations to elect to operate as a "close corporation" by so providing in the appropriate corporate documents. *See id.* §§ 21.563(a), 21.701, 21.705–.707.

**35.** *See, e.g.,* Douglas K. Moll, *Majority Rule Isn't What It Used to Be: Shareholder Oppression in Texas Close Corporations*, 63 Tex. B.J. 434, 436 (2000) [hereafter, "Moll, *Majority Rule*"] ("A close corporation is a business organization typified by a small number of stockholders, the absence of a market for the corporation's stock, and substantial shareholder participation in the management of the corporation.").

**36.** *See id.* ("[C]lose corporation investors are often linked by family or other personal relationships that result in a familiarity between the participants.").

ment, minority shareholders who lack both contractual rights and voting power may have no control over how those disputes are resolved. As a group of law school professors appearing as amicus curiae [37] in this case observed, minority shareholders in closely held corporations have "no statutory right to exit the venture and receive a return of capital" like partners in a partnership do, and "usually have no ability to sell their shares" like shareholders in a publicly held corporation do; thus, if they fail to contract for shareholder rights, they will be "uniquely subject to potential abuse by a majority or controlling shareholder or group." Unhappy with the situation and unable to change it, they are often unable to extract themselves from the business relationship, at least without financial loss.

Those in control of a closely held corporation may use various "squeeze-out" or "freeze-out" tactics to deprive minority shareholders of benefits, to misappropriate those benefits for themselves, or to induce minority shareholders to relinquish their ownership for less than it is otherwise worth. The types of conduct most commonly associated with such tactics include (1) denial of access to corporate books and records, (2) withholding payment of, or declining to declare, dividends, (3) termination of a minority shareholder's employment, (4) misapplication of corporate funds and diversion of corporate opportunities for personal purposes, and (5) manipulation of stock values.[38]

Our review of the case law and other authorities also convinces us that it is both foreseeable and likely that some directors and majority shareholders of closely held corporations will engage in such actions with a meaningful degree of frequency and that minority shareholders typically will suffer some injury as a result. Although the injury is usually merely economic in nature, it can be quite substantial from the minority shareholder's perspective, as it often completely undermines their sole or primary motivation for engaging with the business.[39] We thus conclude that the foreseeability, likelihood, and magnitude of harm sustained by minority shareholders due to the abuse of power by those in control of a closely held corporation is significant, and Texas law should ensure that remedies exist to appropriately address such harm when the underlying actions are wrongful.

**B. Existence and Adequacy of Other Protections**

■■■ Our conclusion that the risks require a remedy does not end our analysis. *See, e.g., Nabors Drilling*, 288 S.W.3d at 411 (observing that the mere foreseeability of an injury is not sufficient to justify the creation of a new duty). We must next consider the adequacy of remedies that already exist. This is particularly true when we are addressing corporations and the relationships among those who participate in them, which we have consistently recognized are largely matters governed by statute and contract. *See Empire*

---

37. Robert A. Ragazzo, Marc I. Steinberg, Alan R. Bromberg, Joseph K. Leahy, Bruce A. McGovern, Gary S. Rosin, and David Simon Sokolow.

38. *See, e.g.,* Moll, *Majority Rule*, at 436 (listing common "freeze-out" or "squeeze-out" tactics); Rogers, *supra* note 27, at 599–600 (listing conduct typical in oppression cases).

39. *See, e.g.,* Douglas K. Moll, *Reasonable Expectations v. Implied–in–Fact Contracts: Is the Shareholder Oppression Doctrine Needed?*, 42 B.C. L.Rev. 989, 1067 (2001) (observing that when dividends are not paid, "a minority shareholder who is discharged from employment and removed from the board of directors is effectively denied any return on his or her investment").

*Mills v. Alston Grocery Co.,* 15 S.W. 505 (Tex.App.1891, no writ) ("A corporation is the creature of a statute immediately creating it, or authorizing proceedings for its organization."); *Calvert v. Capital Sw. Corp.,* 441 S.W.2d 247, 255 (Tex.Civ.App.-Austin 1969, writ ref'd n.r.e.) ("[T]he charter of a corporation creates contractual relations between the corporation and its shareholders, not between the shareholders themselves."). In addition to statutory and contractual protections, we will also consider other common-law remedies that currently exist to protect against the kinds of conduct that might otherwise justify a new common-law remedy.

■ As we consider existing statutory remedies, we are mindful of the principle that, when the Legislature has enacted a comprehensive statutory scheme, we will refrain from imposing additional claims or procedures that may upset the Legislature's careful balance of policies and interests. *See, e.g., Liberty Mut. Ins. Co. v. Adcock,* 412 S.W.3d 492, 493 (Tex.2013) (noting that the Texas Workers' Compensation Act "is a comprehensive statutory scheme, and therefore precludes the application of claims and procedures not contained within the Act.").[40] We thus begin in in this case by noting that the Business Organizations Code permits corporations to declare themselves to be "close corporations," which allows them to take advantage of two subchapters of the Code dedicated to the special needs of such corporations and exempts them from many of the rules that govern other types

of corporations. *See* Tex. Bus. Orgs.Code §§ 21.701–.732 (subchapter O, Close Corporations), 21.751–.763 (subchapter P, Judicial Proceedings Relating to Close Corporations). In addition to the judicial proceedings that other corporate shareholders can bring, shareholders in close corporations are authorized to institute proceedings to enforce a close corporation provision, appoint a provisional director, or appoint a custodian. *Id.* § 21.752. In such proceedings, courts must enforce close corporation provisions regardless of whether there is an adequate remedy at law and may enforce them by injunction, specific performance, damages, appointment of provisional director or custodian, appointment of a receiver for specific corporate assets, appointment of a rehabilitative receiver, or appointment of a liquidating receiver, among other things. *Id.* § 21.756. And the Legislature has afforded businesses that elect to operate as close corporations even greater contractual liberty. *See generally* Tex. Bus. Orgs. Code §§ 1.001 *et seq.; id.* § 21.701–.732. Although RIC's founders and shareholders did not declare RIC a close corporation and take advantage of this unique statutory scheme, we must note that they could have done so, and by doing so could have provided themselves with remedies to resolve the current dispute.

Even when a closely held corporation does not elect to operate as a "close corporation," the Legislature has enacted special rules to allow its shareholders to more easily bring a derivative suit on behalf of

40. *See also Humble Sand & Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 193–94 (Tex.2004) ("The existence of a comprehensive regulatory scheme to protect against harm weighs against imposing a common law duty to accomplish the same result if the scheme affords significant protections."); *Mission Petroleum Carriers, Inc. v. Solomon,* 106 S.W.3d 705, 715–16 (Tex.2003) (declining to impose a new common-law duty on employers who conduct in-house drug testing because "the DOT's comprehensive statutory and regulatory scheme, coupled with the authority granted to the [Medical Review Officer], affords significant protection to employees who are the subject of random drug tests.").

the corporation.[41] TEX. BUS. ORGS.CODE § 21.563. Shareholders in a closely held corporation, for example, can bring a derivative action without having to prove that they "fairly and adequately represents the interests of" the corporation, id. § 21.552(2), without having to make a "demand" upon the corporation, as in other derivative actions, and without fear of a stay or dismissal based on actions of other corporate actors in response to a demand. See id. §§ 21.563(b), 21.553–55, 21.558–59. And when justice requires, the court may treat a derivative action on behalf of a closely held corporation "as a direct action brought by the shareholder for the shareholder's own benefit," and award any recovery directly to that shareholder.[42] See id. § 21.563(c).

Of course, shareholders may also prevent and resolve common disputes by entering into a shareholders' agreement to govern their respective rights and obligations. Importantly, the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the rights, duties, and procedures that govern their relationship with each other and with the corporation. See, e.g., id. §§ 21.052–.059, 21.101–.110, 21.210, 21.401–.408. Again, we note that although RIC's owners did not enter into a shareholders' agreement, they certainly could have done so, and by doing so could have avoided the current dispute.[43]

---

41. See supra note 34.

42. The court may also award the recovery "to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation." TEX. BUS. ORGS.CODE § 21.563(c).

43. The dissent concedes that shareholder and buy-sell agreements are a more "ideal[ ]" means for deciding shareholder disputes. Post at 894. But it contends that people enter closely held businesses "ill-prepared" and implies that the law should step in to pick up the slack. We cannot accept this premise. Courts generally endeavor to afford citizens broad freedoms in their choices about how to manage their own business endeavors. There are numerous well-established justifications for this approach, not the least of which is that courts are simply ill-suited to the task of second-guessing business decisions made by business people who typically have a more long-term perspective, access to more extensive information, greater experience in the industry, if not in business practices generally, and more interest in the outcome. See, e.g., Eric A. Posner, A Theory of Contract Law Under Conditions of Radical Judicial Error, 94 Nw. U.L.Rev. 749, 758 (2000) ("[C]ourts have trouble understanding the simplest of business relationships. This is not surprising. Judges must be generalists, but they usually have narrow backgrounds in a particular field of the law.").

Nor can we assume that the absence of applicable contractual provisions indicates ill-preparedness on the part of business owners. Owners may reasonably choose flexibility over predictability. Minority shareholders may reasonably choose to create mechanisms that would allow them to impede the will of the majority or demand a buyout because they do not want other minority owners to have the same ability to interfere with the operation of the business or to threaten the financial health of the business with an ill-timed demand for buyout.

Finally, even if we accepted the dissent's premise, the buy-out remedy the dissent favors (whether granted under an expansive reading of the receivership statute or the creation of a new common-law cause of action) has not been limited to circumstances where there is no shareholder or buy-sell agreement. In Cardiac Perfusion Services, for example, the court of appeals affirmed a buyout of minority shares in direct contravention of the terms of the parties' buy-out agreement. 380 S.W.3d at 204–05. In Illinois, where the statute on which the dissent relies expressly authorizes a buyout in non-public corporations based on oppressive actions, the courts likewise have applied the statute to force buyouts at prices calculated under the statute rather than the parties express agreement and to force buyouts with terms that are contrary to the parties' express terms for exiting the business. See, e.g., Gingrich v. Midkiff, 2014 IL App (5th) 120332-U, 2014 WL 316547 (affirming

And as a final preliminary matter, we note that various common-law causes of action already exist to address misconduct by corporate directors and officers. Relying on the same actions that support their oppression claims, Texas minority shareholders have also asserted causes of action for: (1) an accounting, (2) breach of fiduciary duty, (3) breach of contract, (4) fraud and constructive fraud, (5) conversion, (6) fraudulent transfer, (7) conspiracy, (8) unjust enrichment, and (9) quantum meruit. *See, e.g., Boehringer*, 404 S.W.3d at 24; *Shagrithaya*, 380 S.W.3d at 262; *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 365 (Tex.App.-Houston [1st Dist.] 2012, judgm't set aside by agr.); *Strebel v. Wimberly*, 371 S.W.3d 267, 274 (Tex.App.-Houston [1st Dist.] 2012, pet. filed); *Adams v. StaxxRing, Inc.*, 344 S.W.3d 641, 643 (Tex.App.-Dallas 2011, pet. denied); *Redmon*, 202 S.W.3d at 231; *DeWoody v. Rippley*, 951 S.W.2d 935, 944 (Tex.App.-Fort Worth 1997, no writ); *Davis*, 754 S.W.2d at 377.

Having noted the extensive statutory, contractual, and common-law protections that already exist under Texas law, we now consider the adequacy of those protections to address the kinds of conduct commonly cited as justifying the creation of liability for "shareholder oppression."

### 1. Denial of Access to Corporate Books and Records

A common complaint of those alleging shareholder oppression is the denial of access to the corporation's books and records. Our Legislature has expressly protected a corporate shareholder's right to examine corporate records, provided penalties for a violation of those rights, and identified applicable defenses in an action to enforce those rights. *See* Tex. Bus. Orgs.Code §§ 21.218 (examination of records), 21.219 (annual and interim statements of corporation), 21.220 (penalty for failure to prepare voting list), 21.222 (penalty for refusal to permit examination), 21.354 (inspection of voting list), 21.372 (shareholder meeting list). These statutory rights and remedies adequately protect a minority shareholder's access to corporate records, and we need not create a new commonlaw cause of action to supplement that protection.[44]

### 2. Withholding or Refusing to Declare Dividends

A second common complaint by those alleging shareholder oppression relates to the corporation's declaration of dividends, including the failure to declare dividends, the failure to declare higher dividends, and the withholding of dividend payments after a dividend has been declared.[45] With regard to the latter situation, we note that shareholders already have a right to receive payment of a declared dividend in accordance with the terms of the shares and the corporation's certificate of formation, and they can enforce that right as a debt against the corporation. *See, e.g.,*

---

judgment in case where court calculated buyout price under statute rather than valuation formula in shareholder agreement and where court declined to impose shareholder agreement's non-compete limitation on withdrawing or expelled shareholders).

**44.** The dissent accuses Ritchie, Dennard, and Lutes of withholding corporate records from Rupe, but the court of appeals held that there was no evidence of such actions and Rupe did not appeal that holding.

**45.** The declaration of dividends for some but not all classes of stock could also form the basis for such a complaint, but we have not seen this kind of claim in Texas cases. When a Texas corporation has more than one class of shares, the corporation's certificate of formation must specify the preferences, limitations, and relative rights of the shares. Tex. Bus. Orgs.Code § 3.007(b)(4).

*Cavitt v. Amsler*, 242 S.W. 246, 247 (Tex. Civ.App.-Austin 1922, writ dism'd) ("[W]hen a dividend is declared, it becomes a debt owing by the corporation to the stockholders."). Our review of the cases gives us no reason to doubt the adequacy of this remedy to address that particular situation.

With regard to the failure to declare dividends and the failure to declare higher dividends, Texas statutes generally do not dictate when directors must declare dividends or how much the dividends must be.[46] Instead, those decisions fall within the discretion of a corporation's directors (or those acting as directors). *See* TEX. BUS. ORGS.CODE §§ 21.302–.303, 21.310–.313; *see also id.* §§ 21.714, 21.726–.727. The directors must make those decisions in compliance with the formal fiduciary duties that they, as officers or directors, owe to the corporation, and thus to the shareholders collectively. *See, e.g., Holloway*, 368 S.W.2d at 576–77 (as fiduciaries, corporate directors are "under obligation not to usurp corporate opportunities for personal gain," and must dedicate "uncor-

rupted business judgment for the sole benefit of the corporation"). When directors breach their fiduciary duties by improperly withholding or failing to declare dividends, one or more shareholders can sue the directors for breach of those duties on behalf of the corporation through a derivative action. *See* TEX. BUS. ORGS.CODE §§ 21.551–.563.[47]

This Court first addressed this kind of a claim in the context of a closely held corporation nearly sixty years ago in *Patton*. 279 S.W.2d at 849–53. Although there seems to be some confusion in the courts of appeals, *Patton* was not a "shareholder oppression" case.[48] It was a suit in which a corporation's two minority shareholders alleged that Patton—the corporation's majority shareholder, president, and controlling board member—committed fraud and breached his duties to the corporation.[49] *See id.* at 849. The jury found that Patton had mismanaged the corporation and withheld dividends for the improper purposes of preventing the minority shareholders from sharing in the corporation's profits and depreciating the value of the corpora-

---

46. The Legislature has, however, placed limits on corporate dividends, distributions, and redemptions, primarily to protect the corporation's creditors. TEX. BUS. ORGS.CODE §§ 21.301–.318 (Subchapter G).

47. A corporation may not limit its directors' liability for bad faith breaches of their duties to the corporation, breaches of their duty of loyalty, or transactions from which the directors receive an improper benefit. TEX. BUS. ORGS.CODE § 7.001(b), (c).

48. The *Patton* opinion uses the word "oppression" only once, when describing the kind of future conduct that a rehabilitative receivership may be designed to prevent, in the context of a New Jersey case involving fraud claims by one corporate director against two other corporate directors. *Patton*, 279 S.W.2d at 857 (citing *Laurel Springs Land Co. v. Fougeray*, 50 N.J. Eq. 756, 26 A. 886, 887 (1893)).

49. In *Patton*, we used the phrase "breach of trust," 279 S.W.2d at 854, rather than "breach of fiduciary duty," which has since become the more common phrase outside of trustee actions. The courts have used the two phrases interchangeably. *See, e.g., Phillips v. Phillips*, 820 S.W.2d 785, 792 (Tex.1991) (Gonzalez, J., dissenting) ("Courts impose damages on parties who violate a fiduciary duty in order to punish the party's breach of trust."); *Paddock v. Siemoneit*, 147 Tex. 571, 218 S.W.2d 428, 432 (1949) ("Acts which might well be considered breaches of trust as to other fiduciaries have not always been so regarded in cases of corporate officers or directors."); *Kaufman & Runge v. B. Alexander & Bro.*, 53 Tex. 562, 568 (1880) (finding no claim "involving any bad faith or breach of trust on the part of the agents in appropriating as their own that which, by reason of their fiduciary relation, they were bound to hold in trust for their principals.").

tion's stock. *Id.* The trial court appointed a receiver to liquidate the corporation. *Id.*

We rejected the minority shareholders' mismanagement claims, but we recognized that the finding that Patton had used "his control of the board for the malicious purpose of . . . preventing dividends and otherwise lowering the value . . . of the stock of the [minority shareholders], is something else." *Id.* at 853. We equated this finding with a "breach of trust for which the courts will afford a remedy," *id.* at 854, and the cases on which we relied indicate that we treated that claim as being brought by the shareholders on behalf of the corporation. *See id.* (citing *Becker v. Dirs. of Gulf City St. Ry. & Real–Estate Co.,* 80 Tex. 475, 15 S.W. 1094 (1891); *Cates v. Sparkman,* 73 Tex. 619, 11 S.W. 846 (1889)). We determined that the appropriate remedy in that circumstance was an injunction order compelling payment of the dividends. *Id.* at 859, 279 S.W.2d 848.[50]

Patton demonstrates that when a corporate director violates the duty to act solely for the benefit of the corporation and refuses to declare dividends for some other, improper purpose, the director breaches fiduciary duties to the corporation, and the minority shareholders are entitled to re-lief, either directly to the corporation or through a derivative action.[51] *See Landon v. S & H Mktg. Group, Inc.,* 82 S.W.3d 666, 677 (Tex.App.-Eastland 2002, no pet.) (upholding breach-of-fiduciary-duty claim against officer-director who improperly authorized $40,000 bonus payment to himself). If, on the other hand, the director's decision not to declare dividends is made for the benefit of the corporation, in compliance with the duties of care and loyalty, no relief is warranted. In that instance, a director generally will have fulfilled the duties by acting in the best interest of the corporation, even if there was an incidental injury to one or more individual shareholders. *See, e.g., Rowe v. Rowe,* 887 S.W.2d 191, 198 (Tex.App.-Fort Worth 1994, writ denied) (holding that shareholder could not prevail on breach-of-fiduciary-duty claim against other shareholder because alleged mishandling of funds did not result in any injury to the corporation).

In sum, a remedy exists for dividend decisions made in violation of a director's duties to the corporation and its shareholders collectively, but no remedy exists for decisions that comply with those duties, even if they result in incidental harm to a minority shareholder's individual interests. But even when a corporate

---

**50.** The trial court had awarded a liquidating receivership, and we rejected that remedy as too severe. *Id.* at 859. We noted that although the statutes in effect at the time provided only for dissolution and liquidation, the Legislature had recently passed the not-yet-effective Business Corporation Act, which favored rehabilitative receivership over liquidation when the business was solvent. *Id.* at 854. Citing precedents in which we "seem[ed] ·to recognize a minority right to receivership in cases of *gross or fraudulent mismanagement,* although without particular reference to whether liquidation or something else is to follow," we concluded that, in the "more extreme" cases, Texas courts could, under their general equity power, appoint a receiver "for the less drastic purpose of 'reha-bilitation' " as remedy for the majority shareholder's breach of fiduciary duty, rather than appointing a liquidating receiver under the statute. *Id.* at 857 (emphasis added). As discussed above, this holding related to Texas courts' power to grant different types of receiverships as equitable remedies for existing causes of action—in *Patton,* breach of fiduciary duty—and not whether the receivership statutes created new statutory remedies other than receivership. *See id.*

**51.** *Patton* is thus contrary to the dissent's assertion that majority shareholders can simply refuse to declare dividends for their own personal benefit rather than in the best interest of the corporation. *See ante* at 883.

controller's dividend decision itself does not give rise to a remedy, that is not typically the end of the inquiry. Allegations that directors or controlling shareholders are manipulating dividends to "oppress" minority shareholders typically arise when the accused not only withhold dividends but also use some method to distribute the corporation's profits exclusively to themselves—frequently, by inflating their own salaries. *See, e.g., Boehringer,* 404 S.W.3d at 31–32 (addressing failure to pay dividends coupled with increase in controlling shareholder-director's salary).[52] As discussed below, when corporate controllers misappropriate corporate funds for their own use or pay themselves excessive salaries out of corporate coffers, they do so in violation of their fiduciary duty to the corporation, and the law affords a remedy for that misconduct.

We therefore conclude that the existing duties and remedies applicable to corporate dividend declarations and payments offer adequate protections for minority shareholders under most circumstances.[53] This case does not present any extreme or unusual circumstances that would justify the imposition of additional duties and remedies.

### 3. Termination of Employment

■ A third common complaint of those alleging minority shareholder oppression relates to the termination of the minority shareholder's employment with the corporation. A minority shareholder's loss of employment with a closely held corporation can be particularly harmful because a job and its salary are often the sole means by which shareholders receive a return on their investment in the corporation. We must be particularly careful in considering this complaint, however, because Texas is steadfastly an at-will employment state. "For well over a century, the general rule in this State, as in most American jurisdictions, has been that absent a specific agreement to the

---

**52.** Shareholders can utilize a shareholders' agreement to set the terms of an officer's or director's salary and employment, thus preventing the officers and directors from making those decisions for themselves. *See* Tex. Bus. Orgs.Code §§ 21.101(a)(4), 21.714(b)(9).

**53.** The dissent contends that "typical acts of minority oppression (refusing to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers) usually operate to benefit the corporation and hardly ever harm it." *Post* at 893. But the dissent offers no support for this broad proposition, and we do not agree that this is a valid assumption. The dissent confuses the corporation's interests with the individual interests of its majority shareholders. But a corporate officer or director's duty is to the corporation and its shareholders collectively, not any individual shareholder or subgroup of shareholders, even if that subgroup represents a majority of the ownership. *See, e.g., Redmon,* 202 S.W.3d at 233; *Somers,* 295 S.W.3d at 11; *Lindley,* 349 S.W.3d at 124; *Hoggett,* 971 S.W.2d at 488. We do not

determine the best interest of the corporation by examining only the interest of its majority shareholder(s). *See Holloway v. Skinner,* 898 S.W.2d 793, 797 (Tex.1995) (holding that corporate officer and majority shareholder could be held liable for acting "in a manner that served his interests at the expense of the other shareholders" because his interests and the corporation's were not necessarily aligned). Refusal to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers certainly can harm the corporation, for instance, by lowering the value of its stock. As *Patton* itself demonstrates, the very conduct the dissent claims does not harm the corporation in fact can give rise (and has given rise in the past) to a breach-of-fiduciary-duty claim against the corporate controller who engaged in such conduct to benefit himself at the expense of the corporation. 279 S.W.2d at 853 (holding majority shareholder liable when he used "his control of the board for the malicious purpose of . . . preventing dividends and otherwise lowering the value . . . of the stock of the [minority shareholders]").

contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cnty. Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.1998). We need not address the policy reasons for our commitment to at-will employment in detail here, but we note that we have consistently recognized that it benefits both employees, by allowing them to change employers freely as they deem best, and employers, by allowing them to make employment decision as they deem best, without second-guessing by courts and juries. *See, e.g., Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 776 (Tex.2011) ("A person's right to use his own labor in any lawful employment is ... one of the first and highest of civil rights.") (quoting *Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 740 (1947)); *Chevron Corp. v. Redmon,* 745 S.W.2d 314, 318 (Tex.1987) ("Employers should have the right and the freedom to make their employment decisions without interference unless they discriminate against some protected group which might otherwise be unfairly denied employment.").

Although at-will employment is the default, employers and employees have the freedom to contract for a different employment relationship. *See* Tex. Bus. Orgs. Code § 2.101(5). In fact, the Business Organizations Code expressly permits corporate shareholders to memorialize the terms of employment for a director, officer, or other employee in a shareholders' agreement. *Id.* §§ 21.101(a)(4), 21.714(b)(9). In the absence of such a contract, however, we may not presume that the company and its shareholders elected to forgo their at-will employment rights, for to do so would violate this State's strong policy in favor of at-will employment. *Cf. Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 608 (Tex.2002) ("At-will employment is an important and longstanding doctrine in Texas, and we have been reluctant to impose new common-law duties that would alter or conflict with the at-will relationship." (citations omitted)).

There may be situations in which, despite the absence of an employment agreement, termination of a key employee is improper, for no legitimate business purpose, intended to benefit the directors or individual shareholders at the expense of the minority shareholder, and harmful to the corporation. Though the ultimate determination will depend on the facts of a given case, such a decision could violate the directors' fiduciary duties to exercise their "uncorrupted business judgment for the sole benefit of the corporation" and to refrain from "usurp[ing] corporate opportunities for personal gain." *Holloway,* 368 S.W.2d at 577; *see also Gearhart Indus.,* 741 F.2d at 723–24. As we have already discussed, a shareholder may enforce these duties through a derivative action, *see* Tex. Bus. Orgs.Code §§ 21.551–.563, and the Legislature's special rules would apply if the matter involved a closely held corporation. *Id.* §§ 21.563(b), 21.751–.763. We also note that such actions could potentially be "oppressive" under section 11.404, and thus justify the appointment of a rehabilitative receiver. *See* Tex. Bus. Orgs. Code § 11.404(a)(1)(C); *see also* former art. 7.05(A)(1)(c). For employment terminations that fall short of these extreme circumstances, however, our commitment to the principles of at-will employment compels us to conclude that the opportunity to contract for any desired employment assurances is sufficient.

## 4. Misapplication of Corporate Funds and Diversion of Corporate Opportunities

A fourth common complaint of minority shareholders involves the misapplication of corporate funds and diversion of corporate opportunities. As to this complaint, we need only note that the duty of loyalty that officers and directors owe to the corporation specifically prohibits them from misapplying corporate assets for their personal gain or wrongfully diverting corporate opportunities to themselves. *See, e.g., Holloway*, 368 S.W.2d at 576 ("A corporate fiduciary is under obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so."); *Dunagan v. Bushey*, 152 Tex. 630, 636, 263 S.W.2d 148, 152 (1953) ("The directors of a corporation stand in a fiduciary relationship to the corporation and its stockholders, and they are without authority to act as such in a matter in which a director's interest is adverse to that of the corporation. The directors are not permitted to appropriate the property of the corporation to their benefit, nor should they permit others to do so."); *see also* TEX. BUS. ORGS.CODE § 7.001(c)(1), (3). Like most of the actions we have already discussed, these types of actions may be redressed through a derivative action, or through a direct action brought by the corporation, for breach of fiduciary duty.[54] *See, e.g., Holloway*, 368 S.W.2d at 576; *Becker*, 15 S.W. at 1095–97 (permitting shareholders to bring suit on behalf of company for corporate directors' alleged misapplication of corporate funds); *see also Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex.1990) (holding that sole shareholder could recover on behalf of company, but not in individual capacity, for former shareholder and

officer's misappropriation of corporate assets). And in limited circumstances, as we have discussed, the shareholder may sue directly for a rehabilitative receivership. *See* former art. 7.05(A)(1); TEX. BUS. ORGS. CODE § 11.404(a)(1).

Because the potential harm here is to the corporation and the shareholders collectively, this misconduct does not weigh in favor of recognizing an additional common-law remedy for individual shareholders.

### 5. Manipulation of Stock Values

■ The final common minority shareholder complaint that we will address involves the directors' manipulation of the value of the corporation's stock. Although not alleged here, there may be circumstances in which the controlling shareholders or directors of a closely held corporation seek to artificially deflate the shares' value, perhaps to allow the company or its shareholders to purchase a minority shareholder's shares for less than their true market value, or to hinder a minority shareholder's sale of shares to third parties. *See, e.g., Patton*, 279 S.W.2d at 849–53. As a rule, however, claims based on such conduct belong to the corporation, rather than the individual shareholder. *See Mass. v. Davis*, 140 Tex. 398, 407, 168 S.W.2d 216, 221 (1942). As we explained over 70 years ago:

Generally, the individual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock. This rule is based on the principle that where such an injury occurs each shareholder suffers relatively in proportion to

---

**54.** The dissent's contention that this Court should recognize a common-law duty between majority and minority shareholders, rather than between corporate controllers and the corporation, for this kind of conduct is contrary to well-established Texas law.

*See, e.g., Murphy v. Campbell*, 964 S.W.2d 265, 268 (Tex.1997) (citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex.1990) for the proposition that "one corporate stockholder cannot recover damages from another for misappropriation of corporate assets").

the number of shares he owns, and each will be made whole if the corporation obtains restitution or compensation from the wrongdoer. Such action must be brought by the corporation, not alone to avoid a multiplicity of suits by the various stockholders and to bar a subsequent suit by the corporation, but in order that the damages so recovered may be available for the payment of the corporation's creditors, and for proportional distribution to the stockholders as dividends, or for such other purposes as the directors may lawfully determine. *Id.*[55]

As with the other conduct we have addressed, the directors' fiduciary duties to the corporation provide protection for minority shareholders affected by such conduct when the conduct harms them in their capacity as shareholders. Though we recognize that the directors may endeavor in such conduct to harm the interests of one or more individual minority shareholders without harming the corporation (i.e., without giving rise to damages recoverable in a derivative suit), for the reasons discussed below, we cannot adopt a common-law rule that requires directors to act in the best interests of each individual shareholder at the expense of the corporation.[56]

### 6. Summary of Existence and Adequacy of Other Protections

The Legislature has already dictated what rights of access a shareholder has to corporate books and records, and no party alleges that the Legislature's statutory scheme is inadequate to protect shareholders in closely held corporations from improper denial of access to corporate records. *See, e.g., D'Unger,* 207 S.W.3d at 331; *O'Bryant,* 18 S.W.3d at 216; *Austin,* 967 S.W.2d at 401. The four remaining categories of conduct identified as frequent causes of shareholder oppression—withholding or refusing to declare dividends, termination of employment, misapplication of corporate funds or misappropriation of corporate opportunities, and manipulation of corporate share values—all relate to business decisions that fall under the authority of a corporation's offices and directors. As such, they are subject to an officer or director's fiduciary duties to the corporation. We conclude that these legal duties are sufficient to protect the legitimate interests of a minority shareholder by protecting the well-being of the corporation.[57] Absent a contractual or other

---

**55.** An exception to this rule may apply when the conduct in question breaches a specific duty owed by the actor to the individual shareholder, such as when the conduct gives rise to a breach of contract claim. *See Davis,* 168 S.W.2d at 221; *Wingate v. Hajdik,* 795 S.W.2d at 719; *see also Miga v. Jensen,* 96 S.W.3d 207 (Tex.2002) (action by one shareholder against another for breach of contract for option to purchase stock).

**56.** Of course, if the controlling directors or shareholders act fraudulently to manipulate the shares' value, additional common-law and statutory remedies may apply. *See, e.g.,* Tex. Rev.Civ. Stat. art. 581 (Texas Securities Act); Tex. Bus. & Com.Code § 27.01 (fraud in real estate and stock transactions); *Allen v. Devon Energy Holdings, L.L.C.,* 367 S.W.3d 355, 369 (Tex.App.-Houston [1st Dist.] 2012, judgm't

set aside by agr.) (addressing fraud claims relating to closely held company's purchase of minority shareholders' shares).

**57.** The dissent asserts that our "inclusion of [the business judgment rule] in the definition of oppression negates the very protection the oppression statute afforded until today." *Post* at 903. We note that what the dissent calls "the oppression statute," the Legislature refers to as a rehabilitative receivership statute, only one prong of which includes oppression as one of three types of conduct addressed in that prong. *See* former art. 7.05; Tex. Bus. & Com.Code § 11.404 (titled "appointment of receiver to rehabilitate domestic entity" and located in the "receivership" subchapter of the Code); *id.* § 11.404(a)(1)(C) (authorizing receivership for "illegal, oppressive, or fraud-

legal obligation,[58] the officer or director has no duty to conduct the corporation's business in a manner that suits an individual shareholder's interests when those interests are not aligned with the interests of the corporation and the corporation's shareholders collectively.

We recognize that our conclusion leaves a "gap" in the protection that the law affords to individual minority shareholders, and we acknowledge that we could fill the gap by imposing a common-law duty on directors in closely held corporations not to take oppressive actions against an individual shareholder even if doing so is in the best interest of the corporation. To determine whether imposing such a duty is advisable, however, we must consider the public policies at play, the consequences of imposing the duty, the duty's social utility, and whether the duty would conflict with existing law or upset the Legislature's careful balancing of competing interests in governing business relationships.

## C. Consequences of Proposed Duty

"Tort law ... cannot remedy every wrong." *Roberts v. Williamson*, 111 S.W.3d 113, 118 (Tex.2003). "The fundamental purposes of our tort system are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims." *Id.* We do not believe that the creation of a common-law claim for minority shareholder oppression would

fulfill these purposes, nor is the creation of such a claim necessary to do so.

We begin by considering the type of actions that would qualify as "oppressive" under a common-law cause of action. In deciding whether to recognize a new common-law cause of action, we must consider whether the new duty would provide clear standards that would deter the undesirable conduct without deterring desirable conduct or unduly restricting freedoms. *See Nabors Drilling*, 288 S.W.3d at 410; *Gomez*, 146 S.W.3d at 193. As our discussion of the Legislature's undefined usage of the term "oppressive" has revealed, the term falls far short of providing any clear standards. Adopting the Legislature's intended meaning of "oppressive" as the same meaning for a common-law claim would merely duplicate the statutory cause of action while permitting remedies that the Legislature has chosen not to permit. Yet adopting a meaning of "oppressive" that differs from the Legislature's would only create more confusion and foster both uncertainty and unnecessary litigation. *See Roberts*, 111 S.W.3d at 118–19 (observing that proposed duty would "foster uncertainty" as well as disparity in recovery among similarly situated parties).[59]

Even the most developed common-law standards for "oppression"—the "reasonable expectations" and "fair dealing" tests—have been heavily criticized for

---

ulent" actions by the governing persons of a domestic entity).

58. We have recognized that in some circumstances a special relationship of trust may arise between parties prior to and independent from the parties' business relationship, which can give rise to informal fiduciary duties. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex.1997).

59. *See also Graff*, 858 S.W.2d at 921 (addressing difficulties arising from imposing a duty

without a clear standard of how the duty is satisfied); *Twyman v. Twyman*, 855 S.W.2d 619, 629 (Tex.1993) (Hecht, J., concurring and dissenting) ("The wrongful conduct for which the common law offers redress by an award of damages should be defined by standards sufficiently objective and particular to allow a reasonable assessment of the likelihood that certain behavior may be found to be culpable, and to adjudicate liability with some consistency in the various cases that arise.").

their lack of clarity and predictability.[60] The "reasonable expectations" test may be less amorphous than a case-by-case analysis of whether actions are "fair," but application becomes increasingly difficult when the complaining shareholder obtained his or her shares by gift or inheritance, as was the case here and as is a common occurrence in closely held businesses.[61]

Ultimately, because the standard is so vague and subject to so many different meanings in different circumstances, we conclude that creating new and independent legal remedies for "oppressive" actions is simply bad jurisprudence. Although we do not foreclose the possibility that a proper case might justify our recognition of a new common-law cause of action to address a "gap" in protection for minority shareholders, any such theory of liability will need to be based on a standard that is far more concrete than the meaning of "oppressive."

In addition, even if we were to utilize the Legislature's intended meaning of the term "oppressive," our consideration of the competing interests and consequences convinces us to decline to expand a claim for shareholder oppression to provide relief beyond appointment of a rehabilitative receiver. In this context, we must consider not only the interests of the minority shareholder, but also the potential consequences to the corporation itself, the officers and directors on whom the duty is imposed, the other shareholders of the corporation, and business relationships in general. *See, e.g., Strickland v. Medlen,* 397 S.W.3d 184, 185 (Tex.2013) (listing a myriad of unintentional consequences that might attend liability for compensating emotional damages arising from the loss of a pet). Imposing on directors and officers a common-law duty not to act "oppressively" against individual shareholders is the equivalent of, or at least closely akin to, imposing on directors and officers a fiduciary duty to individual shareholders. We have not previously recognized a formal fiduciary duty to individual shareholders, and we believe that better judgment counsels against doing so.[62]

---

**60.** *See, e.g.,* Timothy J. Storm, *Remedies for Oppression of Non–Controlling Shareholders in Illinois Closely–Held Corporations: An Idea Whose Time Has Gone,* 33 Loy. U. Chi. L.J. 379, 383–84, 435 (2002) (observing that "[a]lthough entire treatises have been written on the subject of minority shareholder oppression, a precise definition remains elusive," that "much of the relevant case law defines oppression more by what it is not, than by what it is," and that "[e]ven proponents of a view of oppression that recognizes the non-controlling shareholder's reasonable expectations admit that these are often 'just vague and half-articulated understandings.' ") (quoting F. Hodge O'Neal, *Close Corporations: Existing Legislation and Recommended Reform,* 33 Bus. Law. 873, 886 (1978)); Sandra K. Miller, *How Should U.K. and U.S. Minority Shareholder Remedies for Unfairly Prejudicial or Oppressive Conduct Be Reformed?,* 36 Am. Bus. L.J. 579, 617 (1999) ("A vague reasonable expectations approach raises concerns for practitioners because in any particular case it is difficult to predict how a court will

rule. It is difficult to counsel a minority owner who may be reluctant to proceed with litigation in the face of an uncertain result. It also is difficult to counsel the majority shareholder as to what conduct is acceptable, particularly after a shareholder dispute develops.").

**61.** *See, e.g.,* Hunter J. Brownlee, *The Shareholders' Agreement: A Contractual Alternative to Oppression As A Ground for Dissolution,* 24 Stetson L.Rev. 267, 286 (1994) (noting that "reasonable expectations" is a vague standard and subject to greater obscurity when some shareholders received their shares by inheritance or gift).

**62.** *See, e.g.,* Mark J. Loewenstein & William K.S. Wang, *The Corporation as Insider Trader,* 30 Del. J. Corp. L. 45, 52 (2005) ("The very idea that a corporation has a fiduciary duty to individual shareholders is troubling. The corporation can act only through its board of directors, ·officers, employees, and other

Finally, we consider public policies regarding the role of the judiciary in government and in society. As we previously noted, we have consistently recognized that corporate relationships are largely matters governed by statute and contract. More than a century ago, this Court expressed our reluctance to allow courts to "control or interfere in the management of the corporate or internal affairs of an incorporated company." *Cates,* 11 S.W. at 848–49; *see also Kroese v. Gen. Steel Castings Corp.,* 179 F.2d 760, 763 (3d Cir.1950) ("Courts are rightly reluctant to interfere with the management of a business concern by the individuals who have been selected by its owners to manage it."); *Salgo v. Matthews,* 497 S.W.2d 620, 625 (Tex.Civ.App.-Dallas 1973, writ ref'd n.r.e.) (discussing the dangers of court intervention in ongoing stockholder disputes). We are equally reluctant to permit courts to interfere with the freely negotiated terms of a private contract, or to insert into such a contract rights or obligations that the parties could have bargained for but did not. *See Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 646 (Tex.1996). The Legislature has by statute provided a remedy for "oppressive" actions that is limited yet sufficient, and shareholders in closely held corporations may further define their respective rights and obligations through shareholder agreements.

## D. Conclusion on Common-law Action for Oppression

The Legislature has crafted a statutory scheme governing domestic corporations. The statutes are detailed and extensive, reflecting legislative policy judgments about when the government should step in

to impose rights and obligations on the parties and when the parties should be free to dictate their own rights and obligations vis-à-vis each other and the business. This Court has the prerogative to superimpose a common-law cause of action upon this statutory framework—though not to alter or contravene the statutory framework—but we exercise that power sparingly, careful not to upset the Legislative balance of policies, and only when warranted by a genuine need. *See, e.g., D'Unger,* 207 S.W.3d at 331; *O'Bryant,* 18 S.W.3d at 216; *Austin,* 967 S.W.2d at 401; *see also Twyman,* 855 S.W.2d at 630 (Hecht, J., joined by Enoch, J., concurring in part and dissenting in part) ("This Court, as steward of the common law, possesses the power to recognize new causes of action, but the mere existence of that power cannot justify its exercise. There must be well-considered, even compelling grounds for changing the law so significantly. Where, as here, no such grounds are given, the decision is more an exercise of will than of reason."). We find no such necessity here, and therefore decline to recognize a common-law cause of action for "shareholder oppression."

## IV.

### Breach of Informal Fiduciary Duties

Finally, we address Rupe's contention that we may affirm the trial court's buy-out order based on the jury's finding in her favor on her breach-of-fiduciary-duty claim. Rupe's fiduciary duty claim is not based on the formal fiduciary duties that officers and directors owe to the corporation by virtue of their management posi-

agents. These actors are obligated to act in the best interests of the corporation, which may not coincide with the best interests of an individual shareholder transacting business with the corporation. There is no reason to

impose a fiduciary obligation on these actors to act in the best interests of an individual shareholder when that shareholder proposes a course of conduct not in the best interests of the corporation.").

tion. Rather, Rupe alleged, and the jury found, that an informal fiduciary relationship existed between her and Dennard, Ritchie, and Lutes.[63] In the court of appeals, Dennard, Ritchie, and Lutes challenged whether such a relationship existed and whether Dennard, Ritchie, and Lutes breached any fiduciary duties if they did exist. They also argued that a court-ordered buyout is not available as a remedy for Rupe's breach-of-fiduciary-duty claim. Because the court of appeals based its decision solely on the finding of oppressive conduct, we remand this case to the court of appeals so that it may resolve Dennard, Ritchie, and Lutes's challenges to Rupe's breach-of-fiduciary-duty claim. The court of appeals previously found that the evidence does not support the jury's valuation of Rupe's shares. Thus, if the court of appeals concludes that Rupe may recover on her breach-of-fiduciary-duty claim, and that the buyout order is available as a remedy, it will need to remand the case to the trial court for a redetermination of the value of Rupe's shares and whether the buyout is equitable in light of the newly determined value and the impact that a buyout at that price will have on RIC and its other shareholders.

## V.

## Conclusion

For the reasons expressed, we reverse the court of appeals' judgment and remand the case to that court for further proceedings consistent with this opinion.

Justice GUZMAN filed a dissenting opinion, in which Justice WILLETT and Justice BROWN joined.

Justice GUZMAN, joined by joined by Justice WILLETT and Justice BROWN, dissenting.

Thirty-seven states, including Texas, have statutes allowing a court to appoint some form of receiver over a closely held corporation for shareholder oppression. Today, Texas becomes the first of these jurisdictions with a statute that unequivocally prefers lesser remedies to effectively preclude those remedies—despite overwhelming authority observing that, to the contrary, many if not all jurisdictions allow these lesser remedies.[1] But even jurisdictions with statutes that are silent on lesser remedies have interpreted their statutes to impliedly allow them. This departure from the plain language of the statute negates protections the law and Texas courts of appeals have long afforded to minority shareholders.[2]

Historically, legislatures have recognized that minority shareholders are particularly vulnerable to abuse by majority shareholders and are thus entitled to significant protections. Without protection, shareholder oppression can significantly devalue or destroy the minority shareholder's investment.[3] As one colloquial anec-

---

**63.** As noted above, an informal fiduciary duty may arise from "a moral, social, domestic or purely personal relationship of trust and confidence," and its existence is generally a question of fact for the jury. *See Cathey*, 167 S.W.3d at 330–31 (quoting *Associated Indem. Corp.*, 964 S.W.2d at 287).

**1.** *See infra* Part II.A.

**2.** *See infra* Part II.A.

**3.** The investment of minority shareholders in closely held corporations is crucial because of the key role closely held corporations play in the American economy. According to Forbes, America's 224 largest privately held companies alone accounted for $1.61 trillion in revenue and over 4.5 million jobs in 2013. Andrea Murphy & Scott DeCarlo, *America's Largest Private Companies 2013*, FORBES (Dec. 18, 2013), http://www.forbes.com/sites/andreamurphy/2013/12/18/americas–largest–private–companies–2013/. Closely held cor-

dote declares, " '[t]here are 51 shares ... that are worth $250,000. There are 49 shares that are not worth a ——' " [4] Over half a century ago, when Texas enacted its shareholder oppression statute, we warned that "[a] minority stock interest is far from 'change left on the counter.' " [5] Ignoring our prescient observation, the Court today largely relegates minority stock interests to the "change left on the counter" we feared they might become. This radical departure from settled precedents and expectations is primarily the result of the Court effectively rewriting the statute to abolish the lesser remedies the statute prefers as well as the Court's strict definition of oppression that will render any recovery highly unlikely. The Court today defines oppression as a decision that harms the corporation and was not determined in the honest exercise of business judgment. But typical acts of minority shareholder oppression (refusing to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers) usually operate to benefit the corporation and hardly ever harm it.[6] The ultimate effect of this holding is to negate the very foundations of protection the legislatures and U.S. courts have long afforded to minority shareholders in closely held corporations.

Here, the minority shareholder prevailed on her oppression and fiduciary duty claims at trial by presenting legally sufficient evidence that the majority shareholders and corporation made bargain offers to buyout her stock, warned her that it would be the only purchaser of her stock, withheld corporate information from her, refused to meet with prospective purchasers of her shares, and paid personal expenses of a majority shareholder with corporate funds. Indeed, the chairman of the corporation's board of directors admitted at trial that refusing to meet with prospective purchasers was oppressive. Because the Court extinguishes meaningful protections for minority shareholders and renders a take nothing judgment on a valid shareholder oppression claim, I respectfully dissent.

## I. Background

The structure of closely held corporations situates minority shareholders in positions uniquely vulnerable to abuse. *Hollis v. Hill*, 232 F.3d 460, 467 (5th Cir.2000). Typically, a board of directors elected by a majority of the voting interest of the shareholders oversees the corporation, which operates through officers that report to the board. TEX. BUS. ORGS. CODE §§ 3.103(b), 21.401(a). Generally, these minority shareholders have no right to participate in the management of the corporation, and the directors often elect themselves as officers of the corporation. As an amicus brief submitted by several professors and faculty of Texas law

porations are a significant category of private companies, which include such organizations as partnerships and sole proprietorships.

**4.** Charles W. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 NOTRE DAME L.REV. 425, 425 (1990) (quoting *Humphrys v. Winous Co.*, 165 Ohio St. 45, 133 N.E.2d 780, 783 (1956)).

**5.** *Patton v. Nicholas*, 154 Tex. 385, 279 S.W.2d 848, 854 (1955).

**6.** *See, e.g.,* Amicus Letter of Robert A. Ragazzo, Marc. I. Steinberg, Alan R. Bromberg, Joseph K. Leahy, Bruce A. McGovern, Gary S. Rosin, & David Simon Sokolow at 4–5, *Ritchie v. Rupe*, No. 11–0447, Supreme Court of Texas, Jan. 15, 2013; *Patton*, 279 S.W.2d at 853 (finding no evidence of damage to a corporation when majority shareholder refused to pay dividends to minority shareholder).

schools [7] demonstrates, the majority shareholders have the power to freeze out the minority shareholders by denying them employment and failing to pay dividends.[8] The majority shareholders can magnify the economic impact of the freeze out scheme by using corporate funds to personally benefit themselves and denying the minority shareholders access to corporate information—conduct commonly referred to as a "freeze out." [9] And the majority shareholders can ultimately offer to redeem the minority shareholder's stock at a bargain price [10]—often referred to as a "squeeze out."

Unlike minority shareholders in partnerships or public corporations, minority shareholders in closely held corporations are uniquely subject to this oppressive conduct because of their inability to freely exit the venture. In a partnership, a minority shareholder has a statutory right to withdraw from the partnership and receive either her share of the proceeds if the remaining partners terminate the partnership or a fair value buyout of her shares if the remaining partners continue the partnership. TEX. BUS. ORGS. CODE §§ 152.501(b)(1), 152.601(1). Likewise, dissatisfied minority shareholders in a publicly held corporation may sell their shares on the open market. But there is no statutory right for a minority share-

holder to exit the corporation and receive a return of her investment. And frequently, the only buyers for minority shares of a closely held corporation are the remaining shareholders—who might be engaging in the oppressive conduct from which they could ultimately profit.

Ideally, minority shareholders would reach buy-sell or shareholder agreements with the majority shareholders before purchasing minority shares. When disputes arise, shareholders could readily turn to their agreements as the basis for their rights without needing to resort to the law to determine the duties owed. But as one commentator has observed, "[f]rom a relational standpoint, people enter closely-held businesses in the same manner as they enter marriage: optimistically and ill-prepared." [11] This case exposes the heightened vulnerability to oppression minority shareholders face: the minority shareholder inherited her shares from her husband, who acquired his shares as a member of a family owned business that foresaw no need for shareholder agreements.

Giving due consideration to the plight of minority shareholders, thirty-one states have statutes that permit even the harsh remedy of allowing courts to appoint a receiver to liquidate a corporation based on shareholder oppression.[12] Another four

---

7. Ragazzo, *supra* note 6.

8. *Id.* at 4–5.

9. *Id.*

10. *Id.* at 5.

11. Murdock, *supra* note 4, at 426; *see also* Douglas K. Moll, *Minority Oppression & the Limited Liability Company: Learning (or Not) from Close Corporation History,* 40 WAKE FOREST L.REV.. 883, 912 (2005) ("Because close corporation owners are frequently linked by family or other personal relationships, there is often an initial atmosphere of mutual trust that diminishes the sense that contractual

protection is needed. Commentators have also argued that close corporation owners are often unsophisticated in business and legal matters such that the need for contractual protection is rarely recognized." (internal citations omitted)).

12. ALA.CODE § 10–2A–1430; ARK.CODE § 4–27–1430; COLO.REV.STAT. § 7–114–301; CONN. GEN. STAT. § 33–896; GA.CODE § 14–2–940; IDAHO CODE § 30–1–1430; 805 ILL. COMP STAT. 5/12.55; IOWA CODE § 490.1430; MD.CODE, CORPS. & ASS'NS § 3–413; MICH. COMP. LAWS § 450.1489; MISS.CODE § 79–4–14.30; MO. ANN. STAT. § 351.494; MONT.CODE § 35–1–938; NEB.REV.STAT. § 21–2985; N.H.REV.STAT.

states allow liquidation for "persistent unfairness" or "unfairly prejudicial" conduct.[13] One state has broader language for when dissolution is appropriate.[14] Thus, thirty-six states in all appear to allow liquidation for oppressive or similar conduct.[15] *See also* Douglas K. Moll & Robert A. Ragazzo, The Law of Closely Held Corporations Fig. 7.1 (2012); Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 Bus. Law. 699, 709 n. 70 (1993).

Here, Ann married into the Rupe family. Her husband's sister, Paula Dennard, informed Rupe that she would "never get any money in this family." Rupe and her husband, Buddy, wanted to add their son as a beneficiary to the family trust that owned 47% of Rupe Investment Corporation (RIC),[16] but Dennard and her children refused. When Buddy passed away, Rupe acquired (together with her son)[17] an 18% interest in RIC.[18] Rupe claims that Dennard and her colleagues Lee Ritchie (a descendant of one of RIC's early owners) and Dennis Lutes (an attorney for RIC and Dennard's family) feared she would sue to reform the trust and add her and Buddy's son as a beneficiary. Dennard serves as chair of RIC's board of directors, and with her children controls over 70% of RIC's voting stock. Ritchie serves as RIC's president, is on the board, and together with his family owns just under 10% of RIC's voting stock. And Lutes serves as vice-president and secretary of RIC and is on the board. Together, Dennard and her children, Ritchie and his family, and Lutes control approximately 79% of RIC's voting shares and three of the board's four positions. The trial court found that Dennard, Ritchie, and Lutes voted the same for every shareholder vote for the entire time relevant to this lawsuit. Before his death, Buddy was RIC's fourth director. RIC's sales were approximately $152 million by 2007.

§ 293–A:14.30; N.J. Stat. § 14A:12–7; N.M. Stat. § 53–16–16; N.Y. Bus. Corp. Law § 1104–a; Or.Rev.Stat. § 60.661; 15 Pa. Stat. § 1981; R.I. Gen. Laws § 7–1.2–1314; S.C.Code § 33–14–300; S.D. Codified Laws § 47–1A–1430; Tenn.Code § 48–24–301; Utah Code § 16–10a–1430; Vt. Stat. tit. 11A, § 14.30; Va.Code § 13.1–747; Wash. Rev.Code § 23B.14.300; W. Va.Code § 31D–14–1430; Wis. Stat. § 180.1430; Wyo. Stat. § 17–16–1430.

**13.** Alaska Stat. § 10.06.628; Cal. Corp.Code § 1800; Minn.Stat. § 302A.751; N.D. Cent. Code § 10–19.1–115.

**14.** *See* N.C. Gen.Stat. § 55–14–30(2)(ii) (authorizing liquidation if "reasonably necessary for the protection of the rights or interests of the complaining shareholder").

**15.** Several states also impose special fiduciary duties on majority shareholders in closely held corporations. *See, e.g., Barth v. Barth*, 659 N.E.2d 559, 561 n. 6 (Ind.1995); *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217, 221 (1989); *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657,

663 (1976). Fiduciary duty protections are discussed in Part II.E, *infra*.

**16.** The father of Buddy Rupe and Paula Dennard established the family trust to benefit his wife, his two children (Buddy and Dennard), and Dennard's three children. At the time, Buddy had one adopted child. The father did not wish to leave voting shares to an adopted child and believed Buddy to be incapable of having children. Accordingly, the family trust provided that Buddy's inheritance of RIC dividends would revert to Dennard and her three children on Buddy's death.

**17.** Almost all of RIC's voting shares were owned by trusts, including the 18% of the voting shares attributable to Rupe and her son. For ease of reference, this opinion will refer to the beneficial interest owners of the trust when possible.

**18.** In accordance with the terms of the family trust, *see supra* note 16, Buddy's RIC dividends of $50,000 per year from his shares in the family trust reverted to Dennard and her children.

After Buddy's death, Ritchie offered to appoint Rupe to RIC's board if she would agree to not sue another stockholder of RIC, which included the trust. Rupe accepted. Subsequently, when her home was facing foreclosure and she encountered a tax problem, Rupe asked if RIC would purchase her shares. Ritchie responded that RIC would prefer to delay any offer to purchase her shares because one of its subsidiaries was attempting to obtain new financing.

Lutes later offered to redeem Rupe's shares for $1 million. Rupe replied that the $1 million buyout offer was "absurd" and was designed to take advantage of her. Dennard, Ritchie, and Lutes then elected Dennard's daughter Gretchen to take Buddy's seat on the board.

Ritchie later offered for RIC to purchase Rupe's shares for approximately $1.7 million (or $5,987 per share) to be paid over a seven-year period. In making the offer, Ritchie warned that RIC would be the only purchaser of her stock. Ritchie admitted at trial this value was calculated using the book value of RIC's shareholder equity, and Ritchie and Lutes both conceded that book value was not necessarily representative of market value.[19] RIC's calculation also deducted 50% of the book value of one of its major subsidiaries,[20] and further reduced the value of Rupe's stock by 46.3%.[21] Ritchie separately informed Dennard that based on the same date he valued Rupe's shares at $5,987 per share, Dennard's shares possessed a book value of $7,032 per share for gift tax purposes. And these offers to purchase Rupe's shares were markedly lower than the per-share prices RIC paid to previous minority shareholders.

Unsatisfied with the offer, Rupe retained investment banker George Stasen to market her stock to third parties. When they met, Dennard, several of her children, and Ritchie greeted Stasen in "a very hostile fashion," and Ritchie refused Stasen's request to meet with any potential third-party buyers. They required Rupe and any potential buyer to execute confidentiality agreements that were not subject to negotiation and that granted RIC sole discretion to approve or disapprove disclosure of requested information.

According to Stasen, potential buyers laughed at him because they could not be expected to "make a decision on an investment from this limited information without meeting the executives" of a closely held corporation like RIC. Stasen explained that "[t]here was no way I could ever sell anything ... [b]ecause there wasn't enough information in the package and everybody wanted to be able to meet Lee Ritchie and talk to the executives of the companies." Importantly Dennard admitted at trial that she disagreed with Ritchie's refusal to meet with potential third-party buyers, she would want to meet with the president of a closely held corporation before investing, Stasen's request of Ritchie was reasonable, and refusing such a request would be "oppressive to a minority shareholder."

Rupe sued Dennard, Ritchie, Lutes, and RIC, claiming shareholder oppression and breach of fiduciary duty. Rupe sought a court-ordered buyout of her shares or, alternatively, the appointment of a receiver

---

**19.** For example, RIC listed an office building for sale for $1.8 million but established its book value at $124,000 due to depreciation.

**20.** RIC subsidiary Hutton Communications was in a financial crisis, but Hutton's chief financial officer testified that its turnaround

began before the date on which RIC assessed the book value of Rupe's shares.

**21.** RIC used this particular discount when buying back certain stock in previous years.

to liquidate RIC. Among other things, the jury found after an eight-day trial that: (1) Dennard, Ritchie, Lutes, and RIC engaged in oppressive conduct; (2) RIC failed to allow Rupe to inspect and copy relevant books and records; (3) Dennard paid personal expenses from RIC's corporate funds; (4) Dennard, Ritchie, and Lutes offered Rupe a position on the board if she would agree to not sue a shareholder of RIC; (5) Dennard, Ritchie, and Lutes engaged in oppressive conduct in their redemption offers and treatment of Rupe with regard to inspection and copying of corporate records; (6) Dennard, Ritchie, and Lutes breached their fiduciary duties to Rupe; and (7) the fair value of Rupe's shares was $7.3 million.[22] The trial court entered judgment in favor of Rupe and ordered Dennard, Ritchie, and Lutes to cause RIC to redeem Rupe's shares for $7.3 million. The court of appeals agreed that the conduct amounted to shareholder oppression and a stock buyout was the most appropriate remedy but remanded for a redetermination of the stock's value in light of the lack of marketability and control. 339 S.W.3d 275, 299, 302.

## II. Discussion

The Court today holds that because the shareholder oppression statute only expressly addresses the remedy of receivership, no other remedy for oppression is available. And because the remedy of receivership is comparably harsh, the Court imposes a stringent definition of oppression by incorporating the business judgment rule. The Court's logic in applying the business judgment rule in this context would presumably also apply to minority shareholder claims for breach of fiduciary duty. But the Court's initial holding that

receivership is the only remedy for oppression is flawed—which necessarily affects the soundness of the Court's remaining holdings.

The shareholder oppression statute *not only* addresses but also *prefers* lesser legal and equitable remedies than receivership—it does not extinguish them. Because courts may impose lesser remedies, the long-standing definition of oppression that has existed at common law in Texas and a host of other jurisdictions (to which the Legislature has acquiesced) should apply. Further, the business judgment rule is fundamentally incongruent with the concept of minority shareholder oppression because that oppression (such as buying minority shares for a bargain price) typically benefits the corporation. And the oppression statute contemplates use of lesser remedies in situations where oppression exists but does not harm the corporation—further indicating the business judgment rule should not apply. Neither does the business judgment rule have a place in minority shareholder claims for breach of fiduciary duty. I address each point in turn.

### A. Remedy

At the heart of this case is the precodified version of the Texas oppression statute, former article 7.05. That provision requires a shareholder seeking a rehabilitative receivership to establish that the directors' acts are "illegal, oppressive, or fraudulent." Act of Mar. 30, 1955, 54th Leg., R.S., ch. 64, art. 7.05(A)(1), 1955 Tex. Gen. Laws 239, 290–91, *amended by* Act of May 3, 1961, 57th Leg., R.S., ch. 169, 1, 1961 Tex. Gen. Laws 319, 319 (hereinafter "former art. 7.05"). Additionally, a court may only appoint a receiver: (1) when the

---

**22.** RIC's $1.7 million offer was calculated utilizing a valuation date of June 30, 2003. The jury assessed the value of Rupe's shares as of June 30, 2006. The court of appeals affirmed the jury's valuation date, which is not at issue in this appeal.

court deems it necessary "to conserve the assets and business of the corporation and to avoid damage to parties at interest," and (2) if "all other requirements of law are complied with" and "all other remedies available either at law or in equity, including the appointment of a receiver for specific assets of the corporation, are determined by the court to be inadequate." Former art. 7.05. In short, a court may appoint a receiver when: (1) the directors engage in oppressive conduct; (2) such conduct harms the corporation; and (3) lesser legal and equitable remedies will not suffice.

But the plain language of the oppression statute *prefers* other remedies—it does not extinguish them. Former article 7.05 provides for receivership only if "all other remedies available either at law or in equity . . . are determined by the court to be inadequate." Former art. 7.05. If no other remedies are available under the statute or common law, as the Court holds, the oppression statute would have no need to express a preference for their use. Such a holding violates our fundamental canon of construction to not render any statutory language meaningless. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."). And in doing so, the Court defeats the very purpose of the Legislature's carefully chosen words.

Other jurisdictions with similar oppression statutes have uniformly interpreted them as allowing other lesser remedies. The Texas oppression statute has its roots in the Illinois Business Corporation Act of 1933,[23] which formed the basis for the Model Business Corporation Act.[24] Courts in states with oppression statutes similar to ours have discussed eight legal and equitable remedies less drastic than a rehabilitative receivership: (1) appointment of a fiscal agent to periodically report to the court; (2) retention of jurisdiction by the court; (3) an accounting of allegedly misappropriated funds; (4) an injunction for oppressive conduct (such as reducing excessive salaries or bonuses); (5) ordering a dividend; (6) ordering a buyout; (7) permitting minority shareholders to purchase additional stock; and (8) awarding damages caused by oppressive conduct. *See, e.g., Baker v. Commercial Body Builders, Inc.,* 264 Or. 614, 507 P.2d 387, 395–96 (1973); *Fix v. Fix Material Co., Inc.,* 538 S.W.2d 351, 357 n. 3 (Mo.Ct.App. 1976). Ironically, the courts that have recognized these remedies attribute the creation of two of them (continuing the exercise of jurisdiction and ordering a dividend) to this very Court-even though the Court extinguishes them today. *See Baker,* 507 P.2d at 395–96 (citing *Patton v. Nicholas,* 154 Tex. 385, 279 S.W.2d 848 (1955)); *Fix,* 538 S.W.2d at 357 n. 3 (same).

Several courts with statutes similar to ours have specifically addressed the propriety of a buyout as a remedy for oppression.[25] Unsurprisingly, the seminal Texas

---

**23.** *Cent. Standard Life Ins. Co. v. Davis,* 10 Ill.2d 566, 141 N.E.2d 45, 49 (1957) ("The concept of oppressive conduct as a ground for dissolution of a corporation in equity appears for the first time in the 1933 act.").

**24.** Murdock, *supra* note 4, at 455.

**25.** *See Balvik v. Sylvester,* 411 N.W.2d 383, 389 (N.D.1987); *Delaney v. Georgia–Pacific*

*Corp.,* 278 Or. 305, 564 P.2d 277, 288 (1977) ("[T]his is an appropriate cause for relief in the form of a requirement that [the majority shareholder] purchase plaintiffs' stock at a fair price."). Oregon has since amended its statute to expressly allow buyouts and other remedies, noting that the listed remedies "shall not be exclusive of other legal and

case on the issue has likewise agreed with this authority in recognizing the availability of a buyout under our oppression statute that expresses a preference for the use of lesser legal and equitable remedies. *Davis v. Sheerin*, 754 S.W.2d 375, 380 (Tex.App.-Houston [1st Dist.] 1988, writ denied) ("Texas courts, under their general equity power, may decree a [buyout] in an appropriate case. . . ."). Texas courts of appeals have agreed.[26] And several courts in other jurisdictions whose oppression statutes address no remedy other than dissolution have found buyouts to be appropriate remedies for oppression.[27]

Importantly, I am aware of no state that has interpreted their shareholder oppression statute as foreclosing all remedies except receivership, as the Court does today. Indeed, other state supreme courts have cited this Court's precedent for the proposition that "[m]ost states have

adopted the view that a dissolution statute does not provide the exclusive remedy for injured shareholders and that the courts have equitable powers to fashion appropriate remedies where the majority shareholders have breached their fiduciary duty to the minority by engaging in oppressive conduct."[28]

Commentators are in accord with the host of jurisdictions that recognize courts retain the authority to implement lesser legal and equitable remedies for shareholder oppression. As one commentator has observed, because most oppression statutes are based on the Model Business Corporation Act, "alternative relief, particularly buy-outs of minority shareholders, is available in most, if not all, jurisdictions."[29] And leading scholars on shareholder oppression have observed that buyouts "are the most common remedy for dissension within a close corporation."[30]

equitable remedies that the court may impose." Or.Rev.Stat. § 60.952(2)–(3).

26. *See, e.g., Christians v. Stafford*, No. 14–99–00038–CV, 2000 WL 1591000, at *2 (Tex. App.-Houston [14th Dist.] Oct. 26, 2000, no pet.) (mem.op.) ("[A] court may order an equitable 'buy-out' of a party's minority shares for oppressive acts of the majority when the party sues both individually in his own right and as a shareholder on behalf of the corporation."); *Advance Marine, Inc. v. Kelley*, No. 01–90–00645–CV, 1991 WL 114463, at *2 (Tex.App.-Houston [1st Dist.] June 27, 1991, no writ) (mem.op.) ("Courts have power to order the equitable remedy of a buy-out by the majority shareholders according to the facts of the particular case."); *see also Balias v. Balias, Inc.*, 748 S.W.2d 253, 256–57 (Tex. App.-Houston [14th Dist.] 1988, writ denied) (affirming trial court's denial of appointment of a receiver where shareholder failed to demonstrate that other remedies would have been inadequate).

27. *See Maddox v. Norman*, 206 Mont. 1, 669 P.2d 230, 237 (1983) ("[A] court sitting in equity is empowered to determine the questions involved in a case and do complete

justice. This includes the power to fashion an equitable result." (citations and quotation marks omitted)); *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274–75 (Alaska 1980); *McCauley v. Tom McCauley & Son, Inc.*, 104 N.M. 523, 724 P.2d 232, 243 (N.M.Ct.App. 1986); *Sauer v. Moffitt*, 363 N.W.2d 269, 274–75 (Iowa Ct.App.1984).

28. *Masinter v. WEBCO Co.*, 164 W.Va. 241, 262 S.E.2d 433, 439–40 (1980) (citing *Patton*, 279 S.W.2d at 853); *see also Rowen v. Le Mars Mut. Ins. Co. of Iowa*, 282 N.W.2d 639, 656 (Iowa 1979) ("Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before." (quotation marks omitted) (citing *Patton*, 279 S.W.2d at 857)).

29. Murdock, *supra* note 4, at 464.

30. Douglas K. Moll, *Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 Duke L.J. 293, 309 n. 56 (2004) (quoting 1 F. Hodge O'Neal & Robert B. Thompson, O'Neal's

But ignoring the plain language of the statute and the great weight of authority against its holding, today Texas becomes the first jurisdiction to hold that an oppression statute abolishes the remedies it expressly prefers.

## B. Definition of Oppression

The Court's first misinterpretation of the statute (that there is but one remedy) results in a second: that oppression must have an unduly restrictive definition. The Court observes that receivership is a harsh or drastic remedy, designed for situations that pose a serious threat to the corporation and its shareholders.[31] 443 S.W.3d at 903; *see also Balias v. Balias*, 748 S.W.2d 253, 257 (Tex.App.-Houston [14th Dist.] 1988, writ denied). The Court has taken a position commentators previously warned against: "the view of dissolution as a 'drastic' remedy generally works to the disadvantage of minority shareholders."[32] Because the Court concludes that receivership is the only remedy under the oppression statute and that it is drastic or harsh, it adopts a novel and strict definition of oppression:

> when [directors or managers] abuse their authority over the corporation with the intent to harm the interests of one or more of the shareholders, in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the corporation.

443 S.W.3d at 871. The business judgment rule shields directors and managers from liability for rational decisions made for the benefit of the corporation.[33] If there is no harm to the corporation, the director or manager has not violated the business judgment rule (and might not have violated the rule even if there is harm to the corporation if the decision was made in the honest exercise of business judgment). Thus, the Court's definition of oppression will only allow recovery if a director or manager fails to honestly exercise her business judgment and harms a minority shareholder as well as the corporation itself.

The Texas oppression statute and the court of appeals cases construing it did not develop in a vacuum. The developing body of law in Texas and beyond indicates why the Court's restrictive definition of oppression is unwarranted. Like many other states, Texas's statute was similar to

---

CLOSE CORPORATIONS § 1. 16, at 1–97 (3d ed.2002)); *see also id.* at 308–09 ("The most common remedy for oppression . . . is a buyout of the oppressed investor's stockholdings. A buyout is advantageous because it provides a mechanism for an oppressed shareholder to extricate his investment from a venture without having to dissolve the corporation. The majority shareholder continues to operate the close corporation and to participate in the company's successes and failures, while the minority shareholder recovers the value of his invested capital and removes himself from the company's affairs."); Murdock, *supra* note 4, at 470 ("The most common form of alternative remedy is the buy-out of the minority shareholder.").

**31.** The remedy of receivership is harsh or drastic when compared to other remedies such as compelling dividends or a buyout because it replaces the shareholders' chosen managers with court-chosen managers. 443 S.W.3d at 903; *Balias*, 748 S.W.2d at 257. But this does not mean that even a receivership for dissolution will cause the corporation to cease to be a going concern. The majority shareholders may well purchase the corporation from the receiver, essentially buying out the minority shareholder.

**32.** Murdock, *supra* note 4, at 426.

**33.** *See Texarkana Coll. Bowl, Inc. v. Phillips*, 408 S.W.2d 537, 539–40 (Tex.Civ.App.-Texarkana 1966, no writ) (holding that a shareholder was not entitled to a remedy for oppression because the directors' decisions were "not inconsistent with the honest exercise of business judgment and discretion").

the Model Act.[34] As discussed above, the overwhelming majority of courts have construed their oppression statutes to allow for remedies other than receivership. *See supra* Part II.A. As commentators have observed, "less drastic remedies [than dissolution] may be justified by less oppressive conduct than that required to dissolve a corporation."[35] Accordingly, courts have "almost uniformly taken a broad approach to defining oppressive conduct, and where alternatives to dissolution do not exist by statute, have upheld the general equitable power of the courts to fashion such alternatives. The pattern appears firmly established"—except as of today in Texas.[36]

New York has primarily shaped the definitions of oppression in the United States.[37] The first New York court to squarely address the issue observed that "[w]hether the controlling shareholders discharged petitioner for cause or in their good business judgment is irrelevant;" rather, what was relevant was the minority shareholder's "reasonable expectations." *In re Topper*, 107 Misc.2d 25, 433 N.Y.S.2d 359, 362 (N.Y.Sup.Ct.1980). The reasonable expectations test for oppression has been further refined as "when the majority's conduct substantially defeats the expectations that objectively viewed were both reasonable under the circumstances and were central to the minority shareholder's decision to join the venture." *Davis*, 754 S.W.2d at 381 (citing *In re Wiedy's Furniture Clearance Ctr. Co.*, 108 A.D.2d 81, 487 N.Y.S.2d 901, 903 (N.Y.App.Div.1985)). High courts in Alaska, Iowa, Maryland, Montana, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, and Washington have followed New York's lead in adopting the reasonable expectations test.[38] And this test is firmly established in Texas jurisprudence, with the Amarillo, Corpus Christi, Dallas, El Paso, Fort Worth, Houston (1st

---

34. The Court believes the Model Act compels its conclusion here because the Act expressly provides a buyout as a remedy. 443 S.W.3d at 898 n. 25. But the Model Act only changed in 1984 to expressly provide a buyout. *Compare* MODEL BUS. CORP. ACT § 14.34 (1984) (establishing procedure for buyout in lieu of dissolution) *with* MODEL BUS. CORP. ACT § 97 (1971) (allowing court to liquidate corporation due to oppressive conduct without specifying other remedies) *and* MODEL BUS. CORP. ACT § 90 (1960) (same). Presciently, the Texas Legislature added in 1955 the flexibility the Model Act did not have until recently by expressly allowing lesser legal and equitable remedies. Former art. 7.05. The Texas Act should not have to expressly enumerate lesser legal and equitable remedies to give the plain statutory language its intended effect.

35. Murdock, *supra* note 4, at 459.

36. *Id.* at 470 (citations omitted); *compare favorably McCauley*, 724 P.2d at 236 ("The absence of a rigidly defined standard for determining what constitutes oppressive behavior enables courts to determine, on a case-by-case basis, whether the acts complained of serve to frustrate the legitimate expectations of minority shareholders, or whether the acts are of such severity as to warrant the requested relief.").

37. Murdock, *supra* note 4, at 465.

38. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 674 (Iowa 2013); *Boland v. Boland*, 423 Md. 296, 31 A.3d 529, 542 (2011); *Scott v. Trans-Sys., Inc.*, 148 Wash.2d 701, 64 P.3d 1, 6 (2003); *Hendrick v. Hendrick*, 755 A.2d 784, 791 (R.I.2000); *Brenner v. Berkowitz*, 134 N.J. 488, 634 A.2d 1019, 1028–29 (1993); *Balvik*, 411 N.W.2d at 387 (N.D.1987); *McCauley*, 724 P.2d at 237–38 (N.M.App.1986); *Stefano v. Coppock*, 705 P.2d 443, 446 n. 3 (Alaska 1985); *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551, 563 (1983); *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 645 P.2d 929, 933 (1982); *see also Adler v. Tauberg*, 881 A.2d 1267, 1269 (Pa.Super.Ct.2005); *Ford v. Ford*, 878 A.2d 894, 904 (Pa.Super.Ct.2005); *Morrow v. Prestonwold, Inc.*, No. CV000445844S, 2002 WL 652369, at *4 (Conn.Super.Ct. Mar. 22, 2002).

and 14th Districts), San Antonio, Texarkana, and Tyler courts. of appeals having applied the test in shareholder oppression cases.[39]

But the reasonable expectations test can be a poor fit when the minority shareholder, such as the one here, inherited her shares (perhaps indicating she had no investment expectations at all).[40] Due to such circumstances, New York courts developed a test for finding oppression if the conduct of the majority becomes "burdensome, harsh and wrongful." *Gimpel v. Bolstein*, 125 Misc.2d 45, 477 N.Y.S.2d 1014, 1020 (N.Y.Sup.Ct.1984). High courts in Maine, Mississippi, Oregon, Rhode Is-

land, and Washington have followed this test,[41] as have the courts of appeals in Texas.[42]

Because of the panoply of legal and equitable remedies Texas and other courts have recognized for oppression, these two definitions of oppression are firmly established in Texas and national jurisprudence and allow courts the flexibility to craft remedies for the varying types of oppression.[43] There is no valid basis to overturn this mountain of jurisprudence, leave Texas out of step with other jurisdictions whose statutes are similar to ours, and chill investment in closely held corporations.

**39.** *See, e.g., Kohannim v. Katoli*, 440 S.W.3d 798, 811 (Tex.App.-El Paso 2013, pet. denied); *Boehringer v. Konkel*, 404 S.W.3d 18, 25 (Tex. App.-Houston [1st Dist.] 2013, no pet.); *Argo Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 265 (Tex.App.-Dallas 2012, pet. filed); *In re Trockman*, No. 07–11–0364–CV, 2012 WL 554999, at *2 (Tex.App.-Amarillo Feb. 21, 2012, no pet.) (mem.op.); *Guerra v. Guerra*, No. 04–10–00271–CV, 2011 WL 3715051, at *6 (Tex.App.-San Antonio Aug. 24, 2011, no pet.) (mem.op.); *Gibney v. Culver*, No. 13–06–112–CV, 2008 WL 1822767, at *16–17 (Tex. App.-Corpus Christi Apr. 24, 2008, pet. denied) (mem.op.); *Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex.App.-Tyler 2006, pet. denied); *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 699–700 (Tex.App.-Fort Worth 2006, pet. denied); *Gonzalez v. Greyhound Lines Inc.*, 181 S.W.3d 386, 392 n. 5 (Tex.App.-El Paso 2005, pet. denied); *Willis v. Donnelly*, 118 S.W.3d 10, 32 n. 12 (Tex.App.-Houston [14th Dist.] 2003) *aff'd in part and rev'd in part on other grounds*, 199 S.W.3d 262 (Tex.2006); *Pinnacle Data Servs., Inc. v. Gillen*, 104 S.W.3d 188, 196 (Tex.App.-Texarkana 2003, no pet.).

**40.** *See* Ragazzo, *supra* note 6, at 10.

**41.** *See Napp v. Parks Camp, Ltd.*, 932 A.2d 531, 538 (Me.2007); *Scott*, 64 P.3d at 6 (Wash.2003); *Hendrick*, 755 A.2d at 791 (R.I. 2000); *Kisner v. Coffey*, 418 So.2d 58, 61 (Miss.1982); *Baker*, 507 P.2d at 393 (Or. 1973); *see also Edenbaum v. Schwarcz–Osz-*

*treicherne*, 165 Md.App. 233, 885 A.2d 365, 378 (2005); *Colt v. Mt. Princeton Trout Club, Inc.*, 78 P.3d 1115, 1118 (Colo.App.2003); *Morrow*, 2002 WL 652369, at *5; *Jorgensen v. Water Works, Inc.*, 218 Wis.2d 761, 582 N.W.2d 98, 107 (Wisc.Ct.App.1998); *Whale Art Co. v. Docter*, 743 S.W.2d 511, 514 (Mo.Ct. App.1987).

**42.** *See, e.g., Kohannim*, 440 S.W.3d at 811; *Boehringer*, 404 S.W.3d at 25; *Shagrithaya*, 380 S.W.3d at 265; *Trockman*, 2012 WL 554999, at *2; *Guerra*, 2011 WL 3715051, at *6; *Gibney*, 2008 WL 1822767, at *16–17; *Gonzalez*, 181 S.W.3d at 392 n. 5; *Willis*, 118 S.W.3d at 32 n. 12; *Gillen*, 104 S.W.3d at 196; *Devji v. Keller*, No. 03–99–00436–CV, 2000 WL 1862819, at *7 (Tex.App.-Austin Dec. 21, 2000, no pet.) (mem.op.); *Davis*, 754 S.W.2d at 382.

**43.** The Court holds that the Legislature cannot acquiesce to decisions that run contrary to a statute's plain language and that longstanding Texas court definitions of oppression are thus invalid. 443 S.W.3d at 895 n. 16. The first proposition is unquestionably true, but the Court's application is incorrect. If, as the Court holds, the statutory definition of oppression should be more restrictive than the common-law definition because the statute applies to more than just closely held corporations, then the common-law claim for oppression should fill the "gap" in protection the Court admittedly leaves with its decision.

## C. The Business Judgment Rule

In addition to crafting a restrictive definition of oppression, the Court embeds in its definition the business judgment rule, shielding majority shareholders and directors from liability for decisions that do not harm the corporation or that were made in the honest exercise of business judgment. But the business judgment rule is fundamentally at odds with the lesser shareholder oppression remedies the oppression statute expressly prefers. The Court's inclusion of the rule in the definition of oppression negates the very protection the oppression statute afforded until today.[44]

When crafting the reasonable expectations test for shareholder oppression, the New York court observed that "[w]hether the controlling shareholders discharged petitioner for cause or in their good business judgment is irrelevant." *Topper*, 433 N.Y.S.2d at 362. A number of other courts have likewise rejected the business judgment rule in minority shareholder oppression cases.[45]

Commentators have agreed that the business judgment rule should not apply in shareholder oppression cases. As one leading commentator has explained:

> [T]he shareholder oppression doctrine recognizes that decisions about such matters by a majority-controlled board can be part of a minority shareholder

freeze-out. The oppression doctrine, therefore, is implicitly premised upon the notion that close corporation employment, management, and dividend decisions require more than a mere surface inquiry into the majority's conduct. Indeed, the fact that courts applying the oppression doctrine are subjecting the majority's actions to "reasonable expectations" or "burdensome, harsh, and wrongful conduct" standards suggests that courts are requiring majority shareholders to do more than merely articulate a rational business purpose for their decisions.

Douglas K. Moll, *Shareholder Oppression in Texas Close Corporations: Majority Rule Isn't What It Used To Be*, 1 Hous. Bus. & Tax. L.J. 12, 20 (2001) (citations omitted); *see also* F. Hodge O'Neal, *Close Corporations: Existing Legislation and Recommended Reform*, 33 BUS. LAW. 873, 884 (1978) (criticizing the business judgment rule as a conceptual barrier to judicial relief for aggrieved minority shareholders).

The typical example of minority shareholder oppression culminates when directors offer to buy a minority shareholder's shares at a fraction of their true value. Such an offer will seemingly always be in the corporation's best interest. For example, the directors here offered at most $1.7 million for shares the jury valued at trial at $7.3 million. If this value were the fair

---

**44.** The Court responds that the business judgment rule is congruent with the portion of the oppression statute, noting that it is "to conserve the property and business of the domestic entity and avoid damage to interested parties." 443 S.W.3d at 895 n. 13. This assessment is misguided for three reasons. First, minority shareholders whose investments are being diminished would seem to qualify as "interested parties." Second, the Court is reading one provision of the statute ("conserve the property and business of the domestic entity") to render two others mean-

ingless ("interested parties" and "all other legal and equitable remedies"). Third, this distortion of the statute leaves a gap in protection under the common law.

**45.** *See, e.g., Grato v. Grato*, 272 N.J.Super. 140, 639 A.2d 390, 396 (N.J.Super.Ct.App.Div.1994); *Fox*, 645 P.2d at 934–35 (Mont.1982); *Smith v. Atl. Props., Inc.*, 12 Mass.App.Ct. 201, 422 N.E.2d 798, 801, 804 (1981); *Exadaktilos v. Cinnaminson Realty Co.*, 167 N.J.Super. 141, 400 A.2d 554, 561 (N.J.Super.Ct. Law Div.1979).

market value,[46] the shareholder oppression could benefit the corporation by $5.6 million if the minority shareholder accepted. Likewise, refusing to pay dividends to shareholders strengthens the corporation's cash reserves, paying a director's personal expenses from corporate funds keeps the director satisfied and in continued service of the corporation, and refusing to meet with prospective purchasers prevents statements that might possibly be the basis for a securities fraud suit. Each such act that potentially oppresses a minority shareholder can benefit the corporation and be justified under the business judgment rule. But after today, the business judgment rule will allow essentially all minority shareholder oppression that does not harm the corporation (and even some liability that does harm the corporation if the directors or majority shareholders made an honest business decision).

### D. Common–Law Cause of Action

The Court also determines "the foreseeability, likelihood, and magnitude of harm sustained by minority shareholders due to the abuse of power by those in control of a closely held corporation is significant, and Texas law should ensure that remedies exist to appropriately address such harm when the underlying actions are wrongful." 443 S.W.3d at 879. But the Court concludes that the common-law standard for minority shareholder oppression is too vague [47] and existing remedies provide adequate protection, thereby obviating the need for a common-law cause of action.

Tellingly, the Court acknowledges that its interpretation of the oppression statute and failure to impose a common-law remedy for oppression "leaves a 'gap' in the protection that the law affords to individual minority shareholders" when the harm to the minority shareholders does not harm the corporation.[48] 443 S.W.3d at 889. Until today, that gap has not existed because Texas courts have interpreted the oppression statute to allow lesser remedies for oppression that harms minority shareholders but not the corporation.

**46.** As explained below, I agree with the court of appeals that the jury's valuation of the minority shareholder's stock at $7.3 million failed to account for the stock's lack of marketability or control. Thus, the fair market value would be somewhat less than $7.3 million.

**47.** One basis for the Court's conclusion is its belief that the common-law reasonable expectations test is difficult to apply when a minority shareholder inherited her shares. 443 S.W.3d at 902. But this is precisely why courts in Texas and a host of other jurisdictions apply the test for burdensome, harsh, and wrongful conduct when addressing inherited shares. *See supra* Part II.B.

**48.** The Court takes solace in the fact that majority shareholders that harm minority shareholders might also be harming the corporation, thus allowing a rehabilitative receiver under the oppression statute or a breach of fiduciary duty claim if the facts support it. 443 S.W.3d at 906 n. 53. The Court specifically opines that "[r]efusal to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers certainly can harm the corporation, for instance, by lowering the value of its stock." *Id.* But such observation reflects a misunderstanding of closely held corporations. For example, refusing to pay dividends to any shareholder yields additional cash reserves. One buying a majority interest in the company would obviously pay more for a company with more cash, which they could extract with the powers associated with their majority interest. One buying a minority interest would not necessarily pay more if they have no legal recourse to compel the majority shareholder to pay a dividend to the minority shareholder (and they have no such recourse after today). Such an example is not difficult to find. It occurred the last time we addressed this issue. In *Patton*, the majority shareholder refused to pay dividends to the minority shareholders, and we held that such conduct did not harm the corporation. 279 S.W.2d at 853.

No other existing remedy the Court discusses adequately protects minority shareholders from such oppression. The remedy that comes closest to affording some relief to the oppressed minority shareholder is a common-law claim for breach of fiduciary duty. But the Court's logic expressly and impliedly negates such a claim. Expressly, the Court observes that we recognized this cause of action in *Patton* and treated it as a derivative action. 443 S.W.3d at 884. But a shareholder only has standing to bring a derivative action if she fairly and adequately represents the interests of the corporation.[49] TEX. BUS. ORGS. CODE § 21.552(2). Thus, a derivative action would only lie in this context when the oppression of the minority shareholder harms the corporation itself. The Court espouses this principle by observing that "actions that are 'oppressive' under the statute ordinarily will not give rise to derivative suits." 443 S.W.3d at 895 n. 15. But in *Patton*, we recognized that the majority shareholder's misconduct did not harm the corporation itself but nonetheless allowed the minority shareholder's claim for breach of fiduciary duty. 279 S.W.2d at 853 ("[W]e find no evidence ... that [the corporation] was damaged."). Thus, if the Court is correct today and minority shareholders may only bring fiduciary

duty claims for the benefit of the corporation, *Patton* is wrong.[50] But, *Patton* is not wrong; it correctly allowed a minority shareholder claim for breach of fiduciary duty even when there was no harm to the corporation.[51] 279 S.W.2d at 853. *Patton* did not require a derivative claim.

The Court's logic also impliedly restricts fiduciary duty claims. As addressed below, the Court's conclusion that the business judgment rule should apply to statutory shareholder oppression claims would seem to apply with equal force to fiduciary duty claims. *See infra* Part II.E. But the rule is fundamentally at odds with the remedy of the fiduciary duty claim, just as it is at odds with shareholder oppression claims. *See supra* Part II.C. In short, the Court acknowledges that its unduly restrictive interpretation of the oppression statute leaves minority shareholders unprotected from conduct that will harm them but not the corporation. It is precisely the Court's restrictive view of the statute that creates the gap in protection and requires a common-law cause of action.

### E. Breach of Fiduciary Duty

Shareholder oppression was not the only cause of action in this proceeding. Rupe also sued for breach of fiduciary duty.

---

49. The Court observes that shareholders in closely held corporations that elect to be close corporations do not have to fairly and adequately represent the interests of the corporation. 443 S.W.3d at 905; TEX. BUS. ORGS.CODE § 21.552. But this offers no remedy for minority shareholders in corporations like RIC that have not elected close corporation status.

50. The Court also notes that the Business Organizations Code allows courts to treat a closely held corporation's shareholder claim as direct rather than derivative. 443 S.W.3d at 880; TEX. BUS. ORGS.CODE § 21.563(c). But because the Court interprets the oppression statute to only allow a remedy if the corporation itself is harmed, treating derivative actions as direct actions offers no meaningful

protection to the oppressed minority shareholder.

51. The Court mischaracterizes *Patton* as standing for the proposition that an improper refusal to declare dividends entitled minority shareholders to relief "either directly to the corporation or through a derivative action." 443 S.W.3d at 884. But we found no harm to the corporation in *Patton* and required the majority shareholder to declare reasonable dividends for up to five years. 279 S.W.2d at 857–58. We required declaring dividends to benefit the shareholders (which had been harmed) rather than the corporation (which had not been harmed by withholding dividends).

Like shareholder oppression, breach of fiduciary duty is a doctrine that protects minority shareholders from abuse and oppression. As one leading commentator has observed:

> The development of the statutory cause of action and the enhanced fiduciary duty reflect the same underlying concerns for the position of minority shareholders, particularly in close corporations after harmony no longer reigns. Because of the similarities between the two remedial schemes ... it makes sense to think of them as two manifestations of a minority shareholder's cause of action for oppression [or] as two sides of the same coin. . . .

Douglas K. Moll, *Shareholder Oppression & Dividend Policy in the Close Corporation*, 60 WASH. & LEE L.REV. 841, 852 (2003) (quotation marks and citations omitted). The fiduciary concept for close corporations arose in the 1970s, when the Massachusetts high court recognized that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975).

As the Fifth Circuit has observed, this "recognition of special rules of fiduciary duty applicable to close corporations has gained widespread acceptance." *Hollis*, 232 F.3d at 468. High courts in Indiana, Maryland, Minnesota, New York, Ohio, Utah, and West Virginia have recognized that majority shareholders can owe fiduciary duties to minority shareholders.[52]

We expressly avoided the issue in *Willis v. Donnelly* because the record there could not support the existence of a fiduciary duty. 199 S.W.3d 262, 276–77 (Tex.2006). But we did recognize the existence of a fiduciary duty in *Patton*, where we held that "[u]ndoubtedly the malicious suppression of dividends is a wrong akin to breach of trust, for which the courts will afford a remedy." 279 S.W.2d at 854. In light of *Patton* and the mainstream approach in American jurisprudence, Texas courts of appeals have determined on a case-by-case basis whether majority shareholders owe an informal fiduciary duty to minority shareholders of closely held corporations.[53] A key factor weighing in favor of a fiduciary duty is the extent to which the majority shareholders dominate control over a closely held corporation. *Redmon v. Griffith*, 202 S.W.3d 225, 237 (Tex.App.-Tyler 2006, pet. denied).

Finally, the business judgment rule should not apply to these fiduciary duty claims. When we recognized a claim for breach of fiduciary duty in *Patton*, the majority shareholder was harming the mi-

---

**52.** *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 929 N.Y.S.2d 3, 952 N.E.2d 995, 1001 (2011); *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 381 (Minn.2011); *McLaughlin v. Schenk*, 220 P.3d 146, 155 (Utah 2009); *Barth*, 659 N.E.2d at 561 n. 6 (Ind.1995); *Crosby*, 548 N.E.2d at 221 (Ohio 1989); *Toner v. Balt. Envelope Co.*, 304 Md. 256, 498 A.2d 642, 648 (1985); *Masinter*, 262 S.E.2d at 438 (W.Va.1980); *see also D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 206 (5th Cir.2010) (applying Connecticut law); *Fiederlein v. Boutselis*, 952 N.E.2d 847, 860 (Ind.Ct.App.2011); *Walta v. Gallegos Law Firm, P.C.*, 131 N.M. 544, 40 P.3d 449, 456–57 (N.M.Ct.App.2001); *Lazenby v. Godwin*, 40 N.C.App. 487, 253 S.E.2d 489, 492 (1979).

**53.** *See, e.g., Redmon*, 202 S.W.3d at 237; *Willis*, 118 S.W.3d at 31; *Pabich v. Kellar*, 71 S.W.3d 500, 504–05 (Tex.App.-Fort Worth 2002, pet. denied); *Hoggett v. Brown*, 971 S.W.2d 472, 487–88 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Fisher v. Yates*, 953 S.W.2d 370, 378–79 (Tex.App.-Texarkana 1997, pet. denied); *Gaither v. Moody*, 528 S.W.2d 875, 877 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.).

nority shareholders but not the corporation itself, and we compelled a dividend to be paid to the minority shareholders. 279 S.W.2d at 853, 857. Had the business judgment rule applied, we could not have compelled a dividend because there was no harm to the corporation.

### F. Application

### 1. Oppression

Rupe prevailed at trial on her shareholder oppression and fiduciary duty claims, and the trial court compelled a $7.3 million buyout. The court of appeals held there was sufficient evidence of shareholder oppression (and therefore did not reach the fiduciary duty issues), but the $7.3 million buyout failed to account for the minority shares' lack of marketability and control. 339 S.W.3d at 302. The jury charge defined oppression as:

> burdensome, harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members, or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts her money to a company is entitled to rely.

As previously addressed, this definition is more appropriate here than the reasonable expectations definition because Rupe inherited her shares and thus had no expectations when making a decision to invest.

The jury found that Dennard, Ritchie, Lutes, and RIC all engaged in oppressive conduct. The jury also affirmatively answered special submissions that: (1) Dennard paid personal expenses from RIC corporate funds; (2) Dennard, Ritchie, and Lutes offered Rupe a position on the board

in exchange for her agreement not to sue a shareholder of RIC; (3) Dennard, Ritchie, and Lutes's buyout offers were oppressive; (4) Dennard, Ritchie, and Lutes's failure to permit Rupe to examine and copy corporate information was oppressive; (5) Dennard, Ritchie, and Lutes owed Rupe a fiduciary duty; (6) Dennard, Ritchie, and Lutes breached their fiduciary duty; and (7) the fair value of Rupe's shares was $7.3 million, not discounted for lack of marketability or control. The trial court entered judgment that compelled a buyout of Rupe's shares for $7.3 million.

Before assessing whether sufficient evidence supports the verdict, one must assess whether the submission was proper. In addition to submitting abroad-form question on oppression,[54] the trial court asked the jury to resolve disputed facts. This submission was proper. If equitable remedies still exist (and the statute specifies they should), the trial court must know what conduct constitutes oppression in order to fashion the least harsh remedy requested to rectify that oppression. For example, if a majority shareholder either refused to pay dividends or issued a bargain buyout offer and the jury simply answered "yes" to the broad-form question, the trial court sitting in equity would not know whether to compel a dividend or a buyout. Because the oppression statute expressly prefers equitable remedies, I believe the trial court's submission of special issues to the jury here was appropriate.

Having determined the trial court's submission was proper, I also believe there is legally sufficient evidence supporting the findings of oppression. Because Rupe inherited her shares, oppression is defined as burdensome, harsh, or wrongful con-

---

**54.** Specifically, the jury was asked: "Do you find that the Defendants engaged in oppressive conduct to the rights of [Rupe] as a shareholder in Rupe Investment Corporation?"

duct.[55] There is evidence of the following conduct the jury found to be oppressive: (1) making inferior offers of $1 million and $1.7 million; (2) warning Rupe that RIC would be the only purchaser of her stock; (3) refusing to meet with prospective purchasers of Rupe's shares; and (4) Dennard paying personal expenses from corporate funds.[56] Regarding the offers to purchase, Ritchie testified he thought Rupe was not entitled to a "fair offer." And the $1.7 million valuation reflected discounts beyond those applied to previous redemptions of minority shares. Regarding the refusal to meet with prospective purchasers, Dennard admitted: (1) she disagreed with Ritchie's refusal to meet with prospective purchasers; (2) she would want to meet with the president of a closely held corporation before investing; (3) the request for Ritchie to meet with prospective purchasers was reasonable; and (4) such a refusal would be "oppressive to a minority shareholder." Lutes also agreed that it would be reasonable for Rupe to expect that RIC would help her sell her stock "[t]o the extent possible," and that "[i]t would have been possible" for Ritchie to have met with potential purchasers. Accordingly, there is some evidence to support the jury's findings of oppression.

## 2. Remedy

Having concluded there is legally sufficient evidence of oppression, the question becomes what remedy is appropriate. Rupe primarily requested a buyout and alternatively requested dissolution if the buyout was inadequate. Dissolution is undoubtedly harsher than a buyout. *See* Robert A. Ragazzo, *Toward a Delaware Common Law of Closely Held Corporations*, 77 WASH. U.L.Q. 1099, 1119 (1999) ("[The buyout] is less harsh than dissolution and often gives both parties what they want most."). But the statute does not allow for dissolution based on oppression. Former art. 7.05. Thus, there is no need to compare the harshness of a buyout to a remedy Rupe never requested.[57]

Because I agree with the court of appeals that it was error for the trial court to instruct the jury to not discount the value of Rupe's stock for its lack of marketability or minority status, I would affirm its judgment remanding for a redetermination of the amount of the buyout. 339 S.W.3d at 302. Under Rule of Appellate Procedure 44.1(b), a new trial may be ordered on a separable part of a proceeding, but a separate trial on unliquidated damages is improper if liability is contested. TEX.R.APP. P. 44.1(b). Here, the amount of the buyout is an equitable remedy rather than a measure of unliquidated damages, and a retrial on the amount of the buyout alone is separable without unfairness to the parties.[58]

---

55. *See supra* notes 40–42 and accompanying text.

56. Despite never having been an RIC employee, Dennard receives health insurance from RIC, receives $2,500 per month, and receives secretarial assistance at home on a weekly basis to balance her personal checkbook and pay her bills. No minority shareholder receives similar benefits.

57. The Court observes that the court of appeals did not analyze whether a buyout is less harsh than a rehabilitative receiver. 443 S.W.3d at 908. But Rupe never requested a rehabilitative receiver. And the court of appeals actually assessed the alleged harshness of the buyout and determined the trial court did not abuse its discretion in light of RIC's $152 million net sales and $55 million in assets. 339 S.W.3d at 298–99. It would seem premature for the court of appeals to fully assess the comparative harshness of a buyout when it remanded for a recalculation of that amount.

58. Rupe's alternative basis of relying on the fiduciary duty claim would not affect that remand for a retrial. Assuming a buyout is the appropriate remedy for the breach of fidu-

### III.   Conclusion

In sum, I cannot agree that a proper construction of the shareholder oppression statute is that the statute extinguishes the very remedies it expressly prefers.   Uniformly, courts in Texas and beyond have held that less harsh remedies at law and equity are available, such as a court-ordered buyout.   Under the time-honored definitions of oppression, there is some evidence that the majority shareholders here engaged in burdensome, harsh, and wrongful conduct by (1) making inferior buyout offers; (2) warning Rupe that RIC would be the only purchaser of her stock; (3) withholding corporate information; (4) refusing to meet with prospective purchasers of Rupe's shares; and (5) paying Dennard's personal expenses with corporate funds.   RIC's chairman even admitted that refusing to meet with prospective purchasers was oppressive.   But because the valuation of Rupe's shares failed to account for their lack of marketability or control, I would affirm the judgment of the court of appeals, which remanded to the trial court for a redetermination of the amount of the buyout.   Because the Court renders judgment that Rupe take nothing on her valid shareholder oppression claim, I respectfully dissent.

ciary duty here, the buyout calculation still failed to account for the shares' lack of mar-

ketability or control.